Scott D. Baker (SBN 84923)
Email: sbaker@reedsmith.com
William R. Overend (SBN 180209)
Email: woverend@reedsmith.com
Adrian Sue Shin (SBN 256960)
Email: sshin@reedsmith.com
Reed Smith LLP
101 Second Street, Suite 1800
San Francisco, CA 94105-3659
Telephone: (415) 543-8700
Facsimile: (415) 391-8269

Steven S. Baik (SBN 184622)
Email: sbaik@reedsmith.com
Carina M. Tan (SBN 185015)
carinatan@reedsmith.com
Reed Smith LLP
1510 Page Mill Road, Suite 110
Palo Alto, CA 94304
Tel: (650) 352-0500
Fax: (650) 352-0699

Attorneys for Plaintiff
REALTEK SEMICONDUCTOR CORPORATION



# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REALTEK SEMICONDUCTOR CORPORATION, a Taiwanese corporation,<br><br>Plaintiff,<br><br>vs.<br><br>LSI CORPORATION, a Delaware corporation; and AGERE SYSTEMS, INC., a Delaware corporation,<br><br>Defendants. | Case No. CV 12 3451<br><br>**ORIGINAL COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**  |

Plaintiff Realtek Semiconductor Corporation ("Realtek") alleges as follows for its Complaint against LSI Corporation ("LSI") and Agere Systems, Inc. ("Agere") (collectively, "Defendants"):

## NATURE OF THE ACTION

1. Realtek brings this action for Defendants' breach of their contractual commitments to the Institute of Electrical and Electronics Engineers Standards Association ("IEEE-SA") and its members, affiliates and adopters — including Realtek.

2. The IEEE-SA is the standard setting arm of the IEEE, and it promulgates technical standards in a variety of fields, including telecommunications. The IEEE-SA has specific policies designed to address situations where a participant in the standards setting efforts owns a patent or patent application deemed "essential" to the standard.

3. Defendant Agere participated in the IEEE-SA standards setting efforts relating to the wireless technology known as "wireless local area network" ("WLAN"). Pursuant to the IEEE-SA policy regarding "essential" patents, Agere agreed to offer to license any of the patents that it identified as "essential" to the applicable WLAN standard(s) to any entity under reasonable rates on a non-discriminatory basis. Realtek is informed and believes and thereon alleges that LSI is legally bound by Agere's contractual obligations to the IEEE-SA, and LSI has admitted the same in writing to Realtek.

4. IEEE-SA and its participants and affiliates and adopters of the standards, including Realtek, relied on Defendants' promises in developing, adopting and implementing IEEE-SA technical standards into WLAN-compliant products. These standards are now implemented worldwide in a variety of electronic devices that have become commonplace. Realtek invested substantial resources in developing and marketing products in compliance with these standards, relying on the assurances of participating patent holders — including Defendants — that any patents asserted to be "essential" by such patent holders would be available for licensing on such terms, regardless of whether such patents were, in fact, used in any particular implementation.

5. Defendants broke their promise to IEEE-SA and its members, affiliates and adopters by refusing to offer to Realtek a license that is consistent with the IEEE-SA's requirements of reasonable and non-discriminatory terms.

6. Defendants' breach of their commitments does not depend on whether any patents which Defendants have identified in relation to standards are, in fact, "essential" to practicing those

standards, whether those standards can be practiced in ways that do not infringe the identified patents or whether Realtek has infringed any valid Defendant patents. Because Defendants promised to license any such patents on reasonable and non-discriminatory terms, companies that rely on those commitments are entitled to avoid becoming embroiled in patent controversies and to receive the benefit of an offer of a reasonable and non-discriminatory license.

7. Accordingly, Realtek seeks: (a) a judicial declaration that Defendants' promises to IEEE-SA and its members, affiliates and adopters constitute contractual obligations that are binding and enforceable by Realtek; (b) a judicial declaration that Defendants have breached these obligations by demanding excessive and discriminatory royalties from Realtek; (c) a judicial accounting of what constitutes a royalty rate in all respects consistent with Defendants' promises for WLAN patents identified as "essential" by Defendants; and (d) a judicial determination of and compensation for Defendants' breach and other wrongful acts.

## PARTIES

8. Plaintiff Realtek is a corporation organized under the laws of Taiwan with its principal place of business at No.2 Innovation Road II, Hsinchu Science Park, Hsinchu 300, Taiwan.

9. Founded in 1987, Realtek is a leading designer and supplier of integrated circuits, including for WLAN technology.

10. Upon information and belief, Defendant LSI is a corporation organized and existing under the laws of Delaware, with its principal place of business at 1621 Barber Lane, Milpitas, California 95035. On information and belief, LSI is the parent company of Defendant Agere and is legally bound by Agere's contractual commitments to the IEEE-SA.

11. Upon information and belief, Defendant Agere is a Delaware corporation having its principal place of business at 110 American Parkway NE, Allentown, Pennsylvania.

12. Upon information and belief, Agere was incorporated in Delaware in 2000 as a result of a reorganization by Lucent Technologies, Inc. ("Lucent), in which Lucent spun off its optoelectronic components and microelectronic businesses into Agere. Upon information and belief, the reorganization and resulting spin-off of Agere as a separate entity were completed in June 2002. Upon information and belief, Lucent itself resulted from a reorganization of AT&T Corporation

("AT&T"). Upon information and belief, Agere obtained rights to these patents which it has represented as "essential" to WLAN through assignment from Lucent, which, in turn, obtained rights to these patents from AT&T.

13. Upon information and belief, Agere was acquired by LSI in 2007 and is a wholly-owned subsidiary of LSI. Upon information and belief, Agere maintains facilities in the Northern District.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1332, because this is an action between citizens of different states and because the value of declaratory and injunctive relief sought, the value of Realtek's rights this action will protect and enforce, and the extent of the injury to be prevented exceed the amount of $75,000, exclusive of interest and costs.

15. Upon information and belief, Defendants are subject to this Court's personal jurisdiction because LSI has its principal place of business in this district, and Agere conducts business and has continuous and systematic contacts with the State of California in this district.

16. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a), 1391(c), and 1391(d).

## BACKGROUND

### Introduction to Standards

17. New wireless technologies typically are only broadly commercialized after service providers and device manufacturers agree on compatible technology specifications for related products or services. For virtually all successful wireless technologies, that process has involved inclusive, multi-participant standards development efforts conducted under the auspices of leading standards development organizations.

18. Technical standards play a critical role in the development of wireless technologies. Standards facilitate the adoption and advancement of technology, as well as the development of products that can interoperate with one another. Companies that produce products compatible with a standard can design products by referencing only the standard documentation, without the need to

communicate separately with every other company with which their products may need to interoperate. Companies producing products that implement and are tested to a standard can therefore be confident that their products will operate with other products that also are compatible with that standard.

19. Standards development also reduces costs for both suppliers and purchasers. For suppliers, standardization reduces the need in many instances to develop products to a particular purchaser's specifications. Accordingly, because a single product or product line may be sold to multiple purchasers and distributed more widely, manufacturing volumes increase and per unit costs decrease. Purchasers benefit from increased price competition among suppliers. Because many suppliers make standards-compliant products, switching suppliers typically does not require a substantial redesign of one's products or a substantial technical transfer to enable the new supplier to produce compatible products. The lower "switching cost" intensifies competition among suppliers, leading to lower prices.

20. As a practical matter, the technologies that are used to allow a consumer electronics device to connect wirelessly to the Internet are described in standards adopted by a recognized SDO (standard development organization), and thereby accepted by key industry members, in order to be commercially successful. For example, Realtek's products could not be incorporated into third-party devices that connect wirelessly to the Internet unless its products were compatible with standards described by an SDO.

21. On the other hand, technical standardization also creates a "lock-in" effect and the risk of "patent hold-up." Although standards are the products of coordination and compromise among competitors, certain aspects of standards may be -- and often are -- claimed by patents. Before standardization, the royalty a patentee can earn from a patent license for its technology is constrained in part by the availability of alternative technical approaches to perform that function. If a standard requires a designer to employ that patented technology, however, the patentee may demand royalties far in excess of what is warranted by the intrinsic value of the technology.

22. In order to reduce the likelihood that implementers of their standards will be subject to abusive practices by patent holders, SDOs have adopted rules, policies and procedures that

address the disclosure and licensing of intellectual property, such as patents or patent applications, that SDO participants may assert in relation to the practice of the standard under consideration. These rules, policies and/or procedures are set out in the intellectual property rights policies ("IPR policies") of the SDOs.

23.     Many IPR policies — including those at issue in this litigation — encourage or require participants to disclose on a timely basis any IPR that they believe are sufficiently relevant to standards under consideration. These disclosures permit the SDOs and their members to evaluate technologies with full knowledge of disclosed IPR that may affect the costs of implementing the standard.

24.     Unless the patent holder specifically discloses that it is not willing to provide licenses under reasonable and non-discriminatory terms, IPR policies — including those at issue in this litigation — require participants claiming to own such "essential" patents to offer licenses for those patents to any implementer of the standard on reasonable and non-discriminatory terms and conditions.  As their inclusion in the IPR policies of various standards development organizations suggests, such commitments are crucial to the standards development process. They enable participants in standards development to craft technology standards with the expectation that an owner of any patented technology will be prevented from demanding unfair, unreasonable, or discriminatory licensing terms and thereby be prevented from keeping parties seeking to implement the standard from doing so or imposing undue costs or burdens on parties seeking to implement the standard.

### Wireless LAN Standards

25.     Defendants' unlawful licensing demands pertain in part to patents that they claim are "essential" to a widely practiced standard for wireless Internet connectivity known as "WLAN," "Wi-Fi," and/or "802.11."

26.     WLAN enables an electronic device to access the Internet wirelessly at high speeds over short distances. WLAN networks typically consist of one or more access points that are connected to an Ethernet local area network, each of which communicates by radio signals with devices such as notebook computers and other electronics devices.

27. The use of WLAN technology has grown in the United States since its introduction in the 1990s. Manufacturers now offer WLAN connectivity in various devices for various reasons.

28. WLAN is based on the 802.11 wireless networking standard developed by the Institute of Electrical and Electronics Engineers ("IEEE") beginning in the early 1990s. The initial 802.11 protocol ("legacy 802.11") was released in 1997. Since then, there have been a number of amendments issued, including, among others, 802.11a (1999), 802.11b (1999), 802.11e (2005, now incorporated into 802.11-2007), 802.11g (2003), 802.11-2007 (consolidation of the a, b, d, e, g, h, i, j amendments), and 802.11n (2009).

### Defendants' Involvement in Development of the WLAN Standards

29. The standard setting arm of IEEE, the IEEE-SA, promulgates technical standards in a variety of fields, including telecommunications. IEEE-SA had an IPR policy at the time it was drafting the 802.11 (WLAN) protocols. Under the IPR policy, when individuals participating in IEEE standards development came to believe that a company, university, or other patent holder owned patents or patent applications that might be "essential" to implement an IEEE standard under development, IEEE-SA would request Letters of Assurance from those entities.

30. The requirements for the Letters of Assurance sought by IEEE are set forth in Clause 6 of the IEEE-SA Standards Board Bylaws. Clause 6 of those Bylaws (which was revised only slightly over the years) generally provides in pertinent part:

A Letter of Assurance shall be either:

a) A general disclaimer to the effect that the submitter without conditions will not enforce any present or future Essential Patent Claims against any person or entity making, using, selling, offering to sell, importing, distributing, or implementing a compliant implementation of the standard; or

b) A statement that a license for a compliant implementation of the standard will be made available to an unrestricted number of applicants on a worldwide basis without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.

31. According to IEEE's IPR policy, Letters of Assurance, once provided, are irrevocable and shall be in force at least until the standard's withdrawal.

32. If the Letters of Assurance were not provided for patents asserted to be "essential" by participants, the IEEE working group either would revise the standard so that compliance could be achieved without facing any potential issues related to such patent(s), discontinue work on the standard altogether, or otherwise proceed in a manner consistent with the non-disclosure and lack of Letters of Assurance so that participating and relying entities would not be exposed to discriminatory patent assertions and/or unreasonable licensing terms.

33. Defendants have represented to Realtek that Agere owns rights in a number of patents and pending applications that it asserts are or may become "essential" to comply with one or more amendments to the 802.11 standard. These patents include U.S. Patent Nos. 6,452,958 ("the '958 patent") and 6,707,867 ("the '867 patent"). Realtek does not concede that such listed patents are either "essential" to the 802.11 standards or are practiced in the implementation of such standards in any Realtek products.

34. Prior to the releases of the 802.11 protocols, Agere submitted Letters of Assurance to the IEEE pursuant to Clause 6 of the IEEE-SA Standards Board Bylaws with respect to those protocols, guaranteeing that any "essential" patents would be licensed under reasonable and non-discriminatory terms and conditions. Defendants' Letters of Assurance apply to any "essential" patents they then held as well as any other "essential" patents they subsequently obtained. Specifically, Agere's Letters of Assurance identified the '958 and '867 patents (the latter by its application number, U.S. Application No. 10/092,295) as including "one or more claims that may be required to practice" the 802.11e and 802.11g standards, and stated that Defendants "is prepared to grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to comply with the [Proposed] IEEE Standard." True and correct copies of Agere's Letters of Assurance are attached hereto as Exhibit A.

35. In reliance on these letters of assurance, IEEE released the 802.11 standard and amendments to that standard which Defendants now asserts incorporated their patented technology. On information and belief, absent the Letters of Assurance, the relevant IEEE working groups would have either revised the standards, employing alternative technologies instead, or stopped working on the protocols.

36. In submitting their Letters of Assurance pursuant to the applicable IEEE IPR policy, Defendants entered into an actual and/or implied contract with IEEE, for the benefit of IEEE members and any entity that implements the 802.11 standard. Defendants are bound by their agreements to offer licenses consistent with the referenced IEEE bylaws.

### Realtek's Reliance on Commitments with Respect to WLAN Technologies

37. Realtek and other companies adopting the WLAN standard relied on Defendants' commitments to ensure that the royalties Defendants would seek would conform to the promises made by Defendants.

38. In reliance on the integrity of the SDO process and the commitments made by Defendants and others regarding WLAN patents they deem "essential," Realtek began developing and selling its products which are compatible with WLAN connectivity. Realtek made its decision to develop and sell products compatible with WLAN connectivity in reliance on, and under the assumption that, it and/or any third party supplier could avoid patent litigation and take a license to any patents that Defendants, or any other company, has disclosed to the WLAN standard under IEEE's well publicized IPR policy.

39. Realtek and other manufacturers of WLAN-compliant products necessarily relied on the commitments of Defendants and others to disclose and license any identified patents under these terms to avoid any patent controversy even if such patents are not necessary to compliant implementations or actually practiced in any particular implementation.

### Defendants' Breach of Their Contractual Obligation to License Their Identified Patents on The Promised Terms

40. In willful disregard of the commitments they made to IEEE and its members, affiliates and adopters, Defendants have refused to extend to Realtek a license consistent with Defendants' promises for their patents that they identified as "essential" to WLAN connectivity.

41. Instead, Defendants have offered to license their allegedly "essential" patents to Realtek under only unreasonable and discriminatorily exorbitant terms. Defendants have thus unreasonably and discriminatorily targeted Realtek's products for the purpose of extracting unreasonable royalties from Realtek.

42. By letter to Realtek, dated March 7, 2012, Warren K. Waskiewicz, LSI's Vice President of Intellectual Property Business, asserted that Realtek products, as incorporated into certain third-party devices, infringe the '958 and '867 patents. On March 12, 2012, less than a week later, Defendants filed a complaint with the U.S. International Trade Commission ("ITC") against Realtek and numerous other respondents. The ITC instituted an investigation based on that complaint on April 11, 2012, USITC Inv. No. 337-TA-837 (Certain Audiovisual Components and Products Containing the Same). The complaint, among other things, alleged that Realtek had infringed the '958 and '867 patents, the same patents Defendants identified as necessary or essential to practice the 802.11 standard.

43. Realtek responded to Mr. Waskiewicz's letter on May 24, 2012, requesting that LSI and/or Agere disclose the reasonable and non-discriminatory ("RAND") license terms consistent with Agere's contractual obligations. On June 20, 2012, LSI provided license terms to Realtek for the identified "essential" patents. Although the terms of the proposal are confidential, the effect of the proposal, if accepted, is that Realtek would be required to pay a royalty that exceeds the selling price of Realtek's products, which is inherently unreasonable. Thus, by failing to license the identified "essential" patents on reasonable terms, Defendants have breached their RAND obligations.

44. Upon information and belief, Defendants have made licensing proposals to other component manufacturers that included a different royalty structure that did not have the impact of requiring a royalty that would exceed the selling price of the component. By treating Realtek differently than similarly-situated prospective licensees, Defendants' proposal to Realtek is discriminatory and unfair. Thus, by failing to license the identified "essential" patents to Realtek on non-discriminatory terms, Defendants have further breached their RAND obligations.

45. Defendants have thereby refused to offer to license their allegedly "essential" patents at a reasonable rate, with reasonable terms, under conditions that are demonstrably free of any unfair discrimination.

46. Defendants have represented that they possesses patents "essential" to such implementations. On that basis, Defendants are required to tender an offer to license their "essential"

patents in all respects consistent with their binding assurances to the IEEE and its members, affiliates and adopters. Defendants' demands constitute a breach of their WLAN commitments.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Breach Of Contract)

47. Realtek realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

48. Defendants entered into express or implied contractual commitments with IEEE-SA and its members, affiliates and adopters relating to the WLAN standard.

49. Each third party that would potentially implement the WLAN technology was an intended beneficiary of those contracts.

50. Defendants were contractually obligated, among other things, to offer a license to their identified patents consistent with the applicable patent policy of the IEEE-SA Standards Board Bylaws.

51. Defendants breached their contract, among other ways, by refusing to offer licenses to their identified patents under reasonable rates, with reasonable terms, and on a non-discriminatory basis.

52. Defendants further breached these contracts by filing patent infringement actions seeking to enjoin Realtek's implementation of the technology of the allegedly "essential" patents and to exclude Realtek from, among other things, importing or selling products that implement such technology. To the extent this technology is actually necessary to implementation of the relevant standards (as Defendants have asserted), Defendants were obligated to offer licenses to Realtek on RAND terms.

53. As a result of Defendants' contractual breaches, Realtek has been injured in its business or property, and is threatened by imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

54. Realtek will suffer irreparable injury by reason of the acts, practices, and conduct of Defendants alleged above until and unless the Court enjoins such acts, practices, and conduct.

55. Among other things, Realtek is entitled to a preliminary and permanent injunction prohibiting Defendants from enforcing their allegedly "essential" patents against Realtek, or from excluding Realtek from implementing the technology allegedly embodied in those patents.

## SECOND CAUSE OF ACTION

### (Promissory Estoppel)

56. Realtek realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

57. Defendants made a clear and definite promise to potential licensees through their commitments to IEEE that they would license identified patents under reasonable rates, with reasonable terms, and on a non-discriminatory basis.

58. The intended purpose of Defendants' promises was to induce reliance. Defendants knew or should have reasonably expected that this promise would induce companies producing products in wireless networking technologies, such as Realtek, to develop products compliant with the relevant standards.

59. Realtek developed and marketed its products and services in reliance on Defendants' promises, as described above, including making its products and services compliant with WLAN technical standards in various Realtek product offerings.

60. Defendants are estopped from reneging on these promises to the IEEE under the doctrine of promissory estoppel.

61. Realtek has been harmed as a result of its reasonable reliance on Defendants' promises and is threatened by the imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

62. Realtek will suffer irreparable injury by reason of the acts and conduct of Defendants alleged above until and unless the court enjoins such acts, practices and conduct.

63. Among other things, Realtek is entitled to a preliminary and permanent injunction prohibiting Defendants from enforcing the allegedly "essential" patents against Realtek and its products.

## THIRD CAUSE OF ACTION

**(Declaratory Judgment that Defendants Must Offer Realtek a RAND License Or That The Alleged "Essential" Patents Are Unenforceable As to Realtek)**

64. Realtek realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

65. Defendants expressly stated in their declarations to IEEE that they would license their patents which it identified as essential to WLAN under reasonable rates and non-discriminatory terms.

66. There is a dispute between the parties concerning whether Defendants have offered to license to Realtek patents consistent with Defendants' declarations and the referenced policy of the IEEE-SA Standards Board.

67. The dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

68. Realtek is entitled to a declaratory judgment that Defendants have not offered license terms to Realtek on terms consistent with Defendants' declarations and the referenced policy of the IEEE-SA Standards Board.

69. Because Defendants have refused to offer a license on RAND terms to Realtek, Realtek is further entitled to a declaratory judgment setting forth the RAND terms and conditions for a license to the RAND terms, including the applicable royalty rate.

70. Realtek is further entitled to a declaratory judgment that if Defendants refuse to offer a license on RAND terms, the allegedly "essential" patents shall be unenforceable as to Realtek.

## FOURTH CAUSE OF ACTION

**(Unfair Competition Under Cal. Bus. & Prof. Code § 17200)**

71. Realtek realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

72. By the acts alleged, Defendants have engaged in unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200, et seq. Defendants' conduct, as set forth in these counterclaims, constitutes unfair and deceptive business acts or practices, significantly threatening

and harming competition in California and elsewhere. Defendants' unfair, and fraudulent business acts and practices are a direct and proximate cause of injury to the public and Realtek.

73. Defendants engaged in unfair and deceptive conduct by refusing to offer licenses with respect to their identified patents, despite their acknowledged RAND commitments to Realtek.

74. Defendants committed unfair business acts or practices by failing to meet their RAND commitments by refusing to offer Realtek a license on RAND terms and by asserting their identified patents against Realtek and pursuing an injunction, notwithstanding that Realtek is licensed, or, in the alternative, has the right to a RAND license for the patents by virtue of Defendants' RAND commitments.

75. As a direct, proximate, and foreseeable result of Defendants' wrongful conduct, as alleged above, competition has been injured in the market for WLAN-compatible products. Defendants' wrongful conduct also brings a significant threat of injury for downstream price, quality, and innovation competition for WLAN-compatible products, thereby causing injury to consumers in California and elsewhere. These threatened injuries include the inevitable passing on to consumers of improper royalties demanded by Defendants and decreases in innovation and quality competition for end products that comply with the WLAN standard. Among other things, Defendants' abusive conduct threatens to dampen innovation for products that comply with the WLAN standard by eliminating manufacturers' ability to invest in and bring to market innovative products with confidence that holders of claimed essential patents will not seek to enjoin their products or demand exorbitant, non-RAND licensing terms.

76. As a direct, proximate, and foreseeable result of Defendants' wrongful conduct, as alleged above, Realtek has suffered harm in California and elsewhere as a supplier of chips for WLAN-compatible products. This harm includes, among other things: Defendants' threatened injunctive relief against Realtek products notwithstanding Defendants' failure to offer a RAND license despite Defendants' assurance that it would offer such RAND licenses and being forced to expend resources to defend claims for patent infringement in other actions. Further, Realtek has suffered or faces the threat of, in particular, increased costs, lower quality or innovation in the market for WLAN-compatible products, loss of profits, loss of customers and potential customers,

loss of goodwill and product image, uncertainty in business planning, and uncertainty among customers and potential customers.

### PRAYER FOR RELIEF

WHEREFORE, Realtek prays for relief as follows:

A. Adjudge and decree that Defendants are liable for breach of contract;

B. Adjudge and decree that Defendants are liable for promissory estoppel;

C. Decree that Defendants have violated the California Unfair Competition Law and enjoin Defendants from further violations of that Law;

D. Decree that Realtek is entitled to license any and all patents that fall within Defendants' commitments to the IEEE in relation to WLAN technology, including the '958 and '867 patents, on a non-discriminatory basis on reasonable terms and conditions;

E. Enjoin Defendants from further demanding excessive royalties from Realtek that are not consistent with Defendants' RAND obligations, and from enforcing, or seeking to enforce, patent infringement claims in the ITC (or elsewhere) in breach of their RAND obligations as alleged above;

F. Decree that if Defendants refuse to offer Realtek a license on a non-discriminatory basis on reasonable terms and conditions, that Defendants' patents are unenforceable as to Realtek and its products;

G. Enter judgment against Defendants for the amount of damages that Realtek proves at trial;

H. Enter a judgment awarding Realtek its expenses, costs, and attorneys fees in accordance with Rule 54(d) of the Federal Rules of Civil Procedure; and

I. For such other and further relief as the Court deems just and proper.

Date: June 29, 2012

By: _____
Adrian Sue Shin
Attorneys for Plaintiff
*REALTEK SEMICONDUCTOR CORPORATION*

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**DEMAND FOR JURY TRIAL**

Realtek hereby demands a jury trial on all issues so triable.

Date: June 29, 2012

By: _____
Adrian Sue Shin
Attorneys for Plaintiff
*REALTEK SEMICONDUCTOR CORPORATION*