# EXHIBIT A

# Part 2 of 2

The use of licensing commitments is part of an effort to preserve the competitive benefits of *ex ante* technology competition. In 2007, the IEEE-SA adopted a new patent policy intended to enhance the competitive aspects of its technology selection process and improve the role that licensing commitments can play.[8] Under this policy (which is similar but not identical to the policy and practice in effect in 1994), holders of potentially "essential" patent claims will still be asked to provide assurance that they will offer reasonable and nondiscriminatory terms, but they will also be asked but not required to state "not to exceed" or maximum terms. The assurance will be irrevocable; a patent-holder can provide a further assurance with different terms, but if an implementer prefers the earlier terms, the patent-holder must make those earlier terms available. The U.S. Department of Justice reviewed this policy and issued a favorable business review letter.[9]

In short, the IEEE-SA standards development process is carefully crafted to develop consensus-based standards that can be widely implemented. The rules rest on the premise that participants in the process will conduct themselves in good faith.

### 3. The Importance of Letters of Assurance

During the time at issue in this matter, the IEEE requested assurance regarding patent-holders' licensing intentions, and the IEEE-SA continues that practice today. The IEEE-SA requests letters of assurance from patent-holders when the working group becomes aware of a potentially essential patent claims. The IEEE-SA cannot compel the patent-holder to provide a favorable assurance (or even to respond at all), but when a potentially essential patent claim or patent-holder has been identified, the absence of a letter of assurance will materially impede the prospects for a standard's approval. If a patent-holder submitted a letter stating that the patent-holder would offer licenses on RAND terms for as long as it held the patent but that it could sell the patent at any time, free and clear of the licensing commitment, the IEEE-SA would not accept the letter.

In this particular matter, the Commission has found that voters in the working group expressly relied upon the 1994 assurance, including specifically its pricing terms. Whether one can point to (and prove in a court of law) actual and specific reliance of this kind in any given instance, however, licensing assurances must be reliable in order to have value in the standards development process. Reliability involves at least two considerations: irrevocability and survival.

*Irrevocability*. If a patent-holder could revoke a letter of assurance, the letter's value to the IEEE-SA would substantially diminish. Indeed, if the patent-holder were able to revoke at any time, the letter would effectively be a non-assurance. In

---

requested Letter of Assurance will preclude approval of the standard (as noted in IEEE Standards Board Bylaws § 6).

[8] *See* IEEE Alters Its Standards Patent Policy To Provide Fuller Disclosure On Licensing (Dec. 4, 2006) (available at http://standards.ieee.org/announcements pr_043007discl.html). The policy took effect on May 1, 2007.

[9] The letter is available at http://www.usdoj.gov/atr/public/busreview/222978.htm.

-4-

2002 the IEEE-SA clarified its rules to make clear what was an implicit obligation that a patent assurance must be irrevocable. The inability to revoke an assurance, however, may cause a patent-holder to be less willing to provide the assurance, or at least to delay its provision until later in the process. Consequently, different Standards Developing Organizations ("SDOs") may choose different points at which an assurance becomes irrevocable. In 2006, the IEEE-SA revised its rules so that letters of assurance become irrevocable once submitted and accepted, but other organizations may choose a different point. Here, however, the precise timing of the purported revocation does not appear to be material, because the Commission has found that it did not occur until after the standard had been approved and after the IEEE and its working group members had relied upon it.

<u>Survival</u>. Similarly, if a patent-holder could cause the licensing commitment to evaporate simply by transferring the patent, the patent-holder would have an affirmative incentive to transfer any patent that was "encumbered" by an assurance. In 2006, the IEEE-SA revised its rules (a) to require that a submitter provide notice to any immediate assignee of the patent, and to impose on the assignee an obligation to notify and similarly bind a subsequent assignee, and (b) to prohibit a submitter from transferring patent rights covered by a Letter of Assurance "with the intent of circumventing or negating any of the representations and commitments made in such Letter of Assurance." Although the IEEE-SA's express rule had not been adopted at the time when National Semiconductor provided the original assurance in this matter, the Commission has found that the original holder (National Semiconductor) in fact provided notice and that both successors had actual knowledge of the licensing commitments.

### 4. Reasonableness and "Second Offer" License Fee

As a matter of policy, the IEEE-SA makes no determination of, and takes no position on, the reasonableness of royalties or other license terms. In "accepting" letters of assurance that include maximum terms or sample licenses, the IEEE-SA itself does not undertake any kind of market-based or reasonableness review of the terms. Certainly members of a working group may take those terms into consideration in their decision-making; the IEEE-SA relies upon letters of assurance to ensure that any offered terms will be reasonable and non-discriminatory (and, where the assurance includes maximum terms, that an offer not exceeding those terms will be made), but that does not constitute approval of the proposed terms by the IEEE-SA.

In this case, the 1994 assurance obligated the patent-holder to offer a license with a maximum royalty of $1,000, but it did not obligate any implementer to accept a license. This leaves open the question of the patent-holder's obligation under a letter of assurance if an implementer fails (inadvertently or otherwise) to accept the offer and take a license within some period. The Commission permits N-Data to seek a royalty of up to $35,000 from implementers.

We do not understand the Commission to be adopting a rule or stating a principle that, in all cases, it would be reasonable for a patent-holder who makes a "second" offer to seek 35 times the amount of the first offer. Nor do we understand the Commission to

be suggesting that a patent-holder's obligations under a letter of assurance are fully discharged by making an initial offer consistent with the terms of a letter of assurance. Rather, we understand the Commission's approach to be a matter of compromise, as well as a function of the age of, and relatively minimal amount required by, the 1994 letter. Moreover, we observe that the Commission has made no finding as to the reasonableness of this amount (or any of the other license terms), and that implementers remain free to contest the reasonableness of those terms (should they so desire), as well as validity and essentiality of the claims, in litigation.

Finally, we note that this matter deals with a license that contained specific terms, rather than a RAND assurance without such terms. Just as it is conceivable that a patent-holder will seek terms in excess of a specific commitment, it is conceivable that a patent-holder might seek terms that are beyond "reasonable" (or are discriminatory). This case does not present that issue, and accordingly the IEEE-SA does not comment.

### 5. Comments on "Appendix D" Letter

As described above, the IEEE-SA has established a procedure for solicitation, receipt, and acceptance of letters of assurance. Under the rules now in place, the IEEE-SA will not accept "free form" letters of assurance (that is, letters that are not on the IEEE-SA's form). Appendix D of the proposed order sets forth the text of a proposed letter to the IEEE-SA that does not conform to the current requirements for letters of assurance and that omits some of the substantive commitments that the IEEE-SA requires. Were the letter submitted today outside the context of the proposed consent order, the IEEE-SA would be obliged not to accept it. Because of the unusual circumstances here, however, if the IEEE-SA receives a letter in substantially the form proposed in Appendix D, the IEEE-SA would post the letter on its website with an appropriate notation (without formally "accepting" the letter).

Because this represents a departure from its stated procedures, the IEEE-SA offers the following observations about the letter:

- The first paragraph of the letter briefly explains the reason for submission, and the IEEE-SA does not comment on it.

- In 1994 the IEEE-SA rules did not prohibit, and currently the IEEE-SA rules expressly permit, a letter of assurance to provide a "not to exceed" rate. The inclusion of an explicit rate term would not preclude the IEEE-SA's acceptance of this letter today.

- Similarly, in 1994 the IEEE-SA rules did not prohibit, and the IEEE-SA's rules now expressly permit, the submission of a sample license agreement. The inclusion of this license would not preclude the IEEE-SA's acceptance of this letter today.

- IEEE-SA rules require an undertaking to provide notice to assignees. The letter does not do this, but the concern is satisfactorily addressed through

paragraph VI, proviso I of the proposed Decision and Order, which is expressly referenced in the letter.

- IEEE-SA rules require that a person submitting a letter of assurance agree that, if the person should later discover potentially essential patent claims that are not covered by an existing letter of assurance, to give the IEEE-SA written notice of its licensing or enforcement intentions for such claims. The Appendix D letter does not contain such an agreement. The absence of this agreement would prevent the IEEE-SA from accepting the Appendix D letter as a Letter of Assurance. (This issue could be addressed through the addition of a sentence reading as follows: "If N-Data becomes aware of additional Patent Claim(s) not already covered by an existing Letter of Assurance that N-Data owns, controls, or has the right to license that may be or become Essential Patent Claim(s) for the 802.3 standard but are not the subject of an existing Letter of Assurance, then N-Data shall submit a Letter of Assurance stating its position regarding enforcement or licensing of such Patent Claims.")

- The final paragraph states that the terms of a March 27, 2002 letter of assurance do not apply to NWay Technology, even though the patents that purport to cover this technology are referenced in that letter. This paragraph is problematic. The IEEE-SA rules do not permit a submitter to revoke a Letter of Assurance, but they do permit submission of an alternative Letter of Assurance. To the extent that this paragraph simply revokes what purported to be a revocation of the original National Semiconductor letter, it is unobjectionable. But if an implementer believes that the terms of the March 27, 2002 letter are somehow more favorable, then the implementer should be permitted to choose to take an NWay license under the March 2002 letter. We do not know that any implementer would believe the March 2002 letter to be more favorable, but again, as a matter of policy, the IEEE-SA does not take a position on the reasonableness of a proposed royalty and other terms. (This issue could be addressed by the addition of the words "Any implementer who wishes to take a license to NWay technology under the 2002 letter, however, may do so.")

\*\*\*\*\*\*\*\*

We appreciate the Commission's careful attention to the issues raised in this matter.

                                                    /Judith Gorman
                                                    Managing Director of Standards and
                                                    Secretary, IEEE Standards Association
                                                    Board of Governors