Scott D. Baker (SBN 84923)
Email: sbaker@reedsmith.com
William R. Overend (SBN 180209)
Email: woverend@reedsmith.com
James A. Daire (SBN 239637)
Email: jdaire@reedsmith.com
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105-3659
Telephone:  (415) 543-8700
Facsimile:  (415) 391-8269

Steven S. Baik (SBN 184622)
Email: sbaik@reedsmith.com
Carina M. Tan (SBN 185015)
carinatan@reedsmith.com
REED SMITH LLP
1510 Page Mill Road, Suite 110
Palo Alto, CA 94304
Tel:  (650) 352-0500
Fax:  (650) 352-0699

Attorneys for Plaintiff
REALTEK SEMICONDUCTOR
CORPORATION

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| REALTEK SEMICONDUCTOR CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>LSI CORPORATION and AGERE SYSTEMS LLC<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIMS. | Case No. 5:12-cv-03451 RMW<br><br>**PLAINTIFF REALTEK SEMICONDUCTOR CORPORATION'S TRIAL BRIEF**<br><br>Trial Date: November 4, 2013<br>Judge:        Honorable Ronald M. Whyte<br>Location:   Courtroom 4, 6th Floor |

1

**TABLE OF CONTENTS**

2

Page

3  I. INTRODUCTION ....................................................................................................1

4  II. BACKGROUND ....................................................................................................1

5  A. The Parties ...................................................................................................1

6  B. Standards Setting Organizations ................................................................2

7  C. The IEEE 802.11 Standards .......................................................................2

8  1. IEEE 802.11 standards and patent policy .......................................2

9  2. Development of 802.11 standard ....................................................3

10  a. 802.11b ...............................................................................4

11  b. 802.11 g..............................................................................5

12  c. 802.11n...............................................................................5

13  D. Defendants' Patents ....................................................................................6

14  1. The '958 patent ...............................................................................6

15  2. The '867 patent ...............................................................................7

16  E. Many Patents Cover The 802.11 Standard .................................................7

17  F. Defendants' Letters of Assurance To The IEEE.........................................7

18  G. Defendants' Breached Their RAND Obligations To The IEEE and
19     Realtek ........................................................................................................8

20  III. ARGUMENT........................................................................................................10

21  A. The RAND Rate Proposed By Realtek For The '958 and '867 Patents
      Should Be Adopted ...................................................................................10

22  1. The Proper Framework For Determining RAND Royalties
23     Requires Avoiding Hold Up And Stacking Errors .........................10

24  2. A RAND Royalty For The '867 and '958 Patents Should Be
      Minimal Because The Ex-Ante And Aggregate Value Of These
25     Patents, Free From Holdup, Is Close To Zero ................................12

26  a. The ex-ante value of the '958 and '867 patents is at best
      minimal because good or better alternatives to these
27     technologies existed and the inventive contribution was
      minimal ...........................................................................13

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

i.    The ex-ante value of the '958 patent is low because many alternatives, including at least one with better performance, were available at the time 802.11b was being developed ................................................................ 14

ii.   The ex-ante value of the '867 patent is low because alternatives existed at the time 802.11b was being developed and it related to an optional feature relevant only to certain Wi-Fi products ........................ 15

3.   The ████████████████ Provides The Most Reliable Benchmark For A RAND Royalty For The '958 And '867 Patents ............... 17

4.   Defendants' Proposed ████████████████████████ For The '958 and '867 Patents Is Not A RAND Royalty ........................... 18

a.   The ████████████████████████ ................................. 19

b.   Defendants' Damages Expert ███████████████████ ████████████████ ........................ 19

B.   Realtek Should Be Awarded All Of Its Attorney's Fees And Costs Associated With The ITC Action Filed By Defendants In Breach Of Their RAND Obligations ................................................................................ 21

1.   Defendants' Expert ████████████████████████ ............................ 21

2.   Defendants' "Mitigation" Defense Is Legally And Factually Unsound ................................................................................ 22

C.   Realtek Is Entitled To A Permanent Injunction ............................................. 23

1.   Likelihood of Irreparable Harm .................................................... 24

2.   Remedies At Law Are Inadequate ................................................ 24

3.   Balancing of Equities ................................................................... 24

4.   Public Interest ............................................................................... 24

IV.   CONCLUSION ................................................................................................. 25

**TABLE OF AUTHORITIES**

**Cases**

*Apple, Inc. v. Motorola, Inc.,*
  869 F. Supp. 2d 901 (N.D. Ill. 2012) ...................................................................... 10

*Douglas Dynamics, LLC v. Buyers Products Co.,*
  717 F.3d 1336 (Fed. Cir. 2013) ............................................................................... 24

*eBay Inc. v. MercExchange, L.L.C.,*
  547 U.S. 388 (2006) .................................................................................................. 24

*Georgia-Pacific Corp. v. United States Plywood Corp.,*
  318 F. Supp. 1116 (S.D.N.Y. 1970) .......................................................... 11, 13, 18

*In the Matter of Motorola Mobility LLC, a limited liability company, and Google, Inc., a corporation,*
  FTC File No. 121-0120 (Jan. 3, 2013) ..................................................................... 25

*Microsoft v. Motorola,*
  No. 10-1823JLR, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013) ............. 12, 13, 20

*Valle de Oro Bank,*
  26 Cal. App. 4th 1686 (1994) ................................................................................... 22

**Rules**

Fed. R. Civ. Proc. 26(a) .............................................................................................. 23

Fed. R. Civ. Proc. 26(e) .............................................................................................. 23

Fed. R. Civ. Proc. 37(c) .............................................................................................. 23

Fed. R. Evid. 401 ......................................................................................................... 23

Fed. R. Evid. 402 ......................................................................................................... 23

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## I.      INTRODUCTION

This Court has already determined that Defendants are liable for breach of contract. Specifically, despite promising to license their allegedly standard essential patents, including the '958 and '867 patents, on reasonable and non-discriminatory ("RAND") terms, Defendants instead initiated an action for infringement of the '958 and '867 patents in the International Trade Commission ("ITC") seeking an exclusion order against Realtek. By initiating the ITC proceeding without first making *any* offer to license the '958 and '867 patents, this Court found that Defendants' breached their RAND obligations to the IEEE and Realtek.

Since obtaining summary judgment of Defendants' breach, the ITC ruled that Realtek does *not* infringe the '958 and '867 patents. Assuming this ruling is upheld, Realtek would have no obligation whatsoever to license the '958 and '867 patents.

At trial, two issues remain. First, the jury will determine the amount of damages to which Realtek is entitled as a result of Defendants' breach of contract. Realtek will introduce evidence of such damages in the amount of attorneys' fees and costs it was forced to incur defending itself in the ITC action as a result of Defendants' established breach. Notably, Defendants' own expert has already conceded such fees and costs are a reasonable measure of Realtek's damages.

Second, the proper RAND royalty rate for the '958 and '867 patents will be determined. To this end, Realtek will prove that the '958 and '867 patents were of little or no value to the 802.11 standard and Realtek's products. As such, Realtek will show that the proper RAND royalty rate for those two patents is de minimis.

Finally, Realtek is entitled to a permanent injunction barring Defendants from enforcing any exclusion order or injunction they might obtain from the ITC proceeding until this Court makes a determination of Defendants' RAND obligations, and Defendants offer a RAND license to Realtek based on the Court's determination.

## II.      BACKGROUND

### A.      The Parties

Realtek is a Taiwanese fabless integrated circuit design house that was established in 1987. At present, Realtek employs over 2,000 people, of which more than 1,500 have research and

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  development expertise.  One of Realtek's product lines is integrated circuits for wireless local area

2  networks ("WLAN").

3      Defendant Agere was incorporated in 2000 as a result of a reorganization of Lucent

4  Technologies, Inc. ("Lucent"), in which Lucent spun off its optoelectronic components and

5  microelectronic businesses into Agere.  Agere obtained the '956 and '867 patents at issue in this case

6  from Lucent.  Defendant LSI then acquired Agere in 2007, and Agere is now a wholly-owned

7  subsidiary of LSI.

8  **B.      Standards Setting Organizations**

9      Standards-setting organizations ("SSOs") have come to play an increasingly important role in

10  our economy.  Interoperability standards have helped to move many important innovations into the

11  marketplace, including the complex communication networks and sophisticated mobile computing

12  devices that are hallmarks of the modern age.  These standards, whether mechanical, electrical,

13  computer-related or communications-related, have incorporated important technical advances that

14  are fundamental to the interoperability of many of the products on which consumers have come to

15  rely.

16      However, standard setting does not come without some risks.  When a standard incorporates

17  patented technology, and the standard becomes established, it may be prohibitively difficult and

18  expensive to switch to a different technology.  As a result, the owner of that patented technology

19  may gain market power and potentially take advantage of it by engaging in patent "hold-up," which

20  entails asserting the patent to exclude a competitor from a market or obtain a higher price for its use

21  than would have been possible before the standard was set.  To reduce such opportunistic conduct,

22  some SSOs have relied on licensing commitments by patent holders, including commitments to

23  license the patents they own that are essential to the standard on RAND terms.

24  **C.      The IEEE 802.11 Standards**

25      **1.      IEEE 802.11 standards and patent policy**

26      This case involves IEEE standards for wireless local area networks known as "WLAN," "Wi-

27  Fi" or "802.11."  The IEEE began standardizing the 802.11 wireless networking standard beginning

28  in the early 1990s.   The IEEE-SA is the standards-setting arm of the IEEE.  The IEEE-SA relies on

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   licensing commitments from the owners of patents that relate to its technical standards, including the

2   802.11 standard.  The IEEE-SA has specific policies that apply where a participant in the standards-

3   setting efforts owns a patent or patent application deemed "essential" to the standard.

4        At all relevant times during the drafting of the 802.11 protocols, the IEEE-SA maintained a

5   policy that required Letters of Assurance from patents holders which owned "essential" patents or

6   patent applications.  Specifically, the IEEE-SA Standard Board Bylaws require that a Letter of

7   Assurance shall be either:

8        a.   A general disclaimer to the effect that the Submitter without conditions will
             not enforce any present or future Essential Patent Claims against any person
9            or entity making, using, selling, offering to sell, importing, distributing, or
             implementing a compliant implementation of the standard; or
10
11       b.   statement that a license for a compliant implementation of the standard will be
             made available to an unrestricted number of applicants on a worldwide basis
             without compensation or under reasonable rates, with reasonable terms and
12           conditions that are demonstrably free of any unfair discrimination.

13       According the IEEE's policies, Letters of Assurance, once provided, are irrevocable and shall

14  be in force at least until the standard's withdrawal.

15  **2.   Development of 802.11 standard**

16       Development of the 802.11 standard by the IEEE began in the early 1990s and the original

17  802.11 standard was first ratified in 1997.  Development of the 802.11 standard and its various

18  versions has been accomplished by task groups working under the 802.11 Working Group, a group

19  of IEEE members responsible for developing the 802.11 standards.

20       A task group's process for forming a draft specification may include, among other things,

21  setting requirements and soliciting proposals, followed by presenting, debating and analyzing and

22  voting on proposals.  A proposal requires seventy-five percent (75%) of the votes cast in order to be

23  selected as the draft specification.[1]  The IEEE standards process also allows members to consider

24  not just technical, but also market-based and other non-technical factors in the process of developing

25  a standard.

26       The 802.11 standard is amended from time to time.  IEEE 802.11a, IEEE 802.11b, IEEE

27  _____
    [1] IEEE-SA Standards Board Bylaws ¶ 5.1 [Dkt. 67-4].

28

PLAINTIFF REALTEK SEMICONDUCTOR CORPORATION'S TRIAL BRIEF

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   802.11e, IEEE 802.11g, and IEEE 802.11n refer to amendments to the IEEE 802.11 standard.  The

2   most recent commercial version of 802.11 is 802.11n, but companies have already been selling

3   products implementing the new 802.11ac standard, which should become widespread within the next

4   year or two.

5         The various 802.11 specifications incorporate hundreds of features, each of which comprises

6   hundreds and possibly thousands of technologies.  Preparation of the 802.11 standards occurred over

7   the course of many years, including typically a number of years between amendments, during which

8   the 802.11 Task Group would meet and discuss these myriad technologies.

9         **a.    802.11b**

10        802.11a and 802.11b standardization occurred from 1997 to 1999.  The IEEE had many

11  technology alternatives when standardizing 802.11a and 802.11b.  For example, the IEEE 802.11b

12  standardization activity had proposals from at least Alantro Communications, Harris, Micrilor,

13  Lucent and Raytheon.  The IEEE 802.11a standardization activity had, for instance, competing

14  proposals from at least Lucent, Breezecom and RadioLAN.

15        For its modulation technology, the IEEE 802.11b standard ultimately included a technology

16  called complementary code keying ("CCK").  LSI/Agere assert that CCK, as used in the 802.11

17  standard, incorporates the alleged invention of the '958 patent.  However, during standardization, the

18  IEEE 802.11b Task Group ("Task Group B") considered multiple technology alternatives to CCK.

19  Indeed, five different alternate technologies were proposed before CCK.  First, Alantro

20  Communications, which was acquired by Texas Instruments, proposed an alternative known as

21  Packet Binary Convolutional Coding ("PBCC").  This technique was based on convolutional coding,

22  which was also being used in products such as cable modems and cellular phones at the time.

23  Notably, the 802.11b standard includes PBCC, an alternative technology to CCK, as a high

24  performance option.  Second, Harris, an early leader in the development of wireless LAN

25  technology, proposed a M-ary Bi-Orthogonal Keying ("MBOK") for 802.11b.  Third, Lucent

26  proposed a technology known as Barker Code Position Modulation ("BCPM") for which they

27  submitted a letter of assurance.  Fourth, Raytheon proposed a technology known as Offset

28  Quadrature Bi-Orthogonal Keying.  And, fifth, Micrilor proposed a technology known as 16-ary

DBOK.[2]

None of the original 802.11b modulation scheme proposals, including the Lucent proposal, was able to reach the 75% voting criterion at the May 1998 meeting. At the July 1998 meeting, Harris and Lucent formed a compromise proposal based on CCK modulation. Because Task Group B had so many technologies to choose from, it had to compromise to reach the 75% voting threshold required to approve the amendment. In fact, Lucent and Harris themselves characterized their proposal as a compromise. CCK was approved as a modulation mode for 802.11b not because it was the superior technology, but because of other factors, including practical considerations regarding a faster time to market for the CCK solution as opposed to other proposed solutions. Indeed, the Task Group also adopted PBCC as a higher performance optional mode.

     **b.**    **802.11 g**

After the IEEE 802.11b specification was ratified, work began on IEEE 802.11g. 802.11g standardization occurred from 1999 to 2003. The objective of IEEE 802.11g was to extend the IEEE 802.11 standard to even higher data rates. Task Group G achieved this by moving away from single tone modulations like CCK and toward orthogonal frequency division multiplexing (OFDM). The 802.11g task group also considered multiple alternative modulation technologies. The 802.11g standardization had, for example, proposals from at least Texas Instruments, Supergold Communications, 3COM and Intersil. The 802.11g Task Group considered both single-tone and OFDM modulation technologies, but neither approach could receive the required 75% for ratification. The compromise adopted the OFDM modulations from the IEEE 802.11a standard for use in the 2.4 GHz ISM band. This compromise was a move away from CCK, which remained only as a vestige by virtue of the fact that 802.11g was backwards-compatible with 802.11b.

     **c.**    **802.11n**

IEEE 802.11n standardization occurred from 2003 to 2009. One goal of 802.11n was to combine and improve upon various features from the previous standards, including its signal

---

[2] QAM modulation with binary convolutional codes was another alternative technology to CCK readily available to Task Group B. In fact, this type of modulation was incorporated into the 802.11a specification developed contemporaneously with that of IEEE 802.11b.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    modulation features.

2          The 802.11n amendment was formally ratified in September 2009.  Unlike previous

3    amendments, which mainly added a new physical protocol layer, 802.11n incorporated numerous

4    enhancements to increase throughput and range while creating more robust connections.  802.11n

5    supports multiple antennas or MIMO to enhance communication by leveraging multipath, a

6    phenomenon in wireless transmissions in which the signal reflects from walls and objects, such as

7    furniture.  While previous amendments operated on 20 MHz channels, the 802.11n amendment also

8    defines the use of 40 MHz channels that are capable of encoding and transmitting more data than the

9    20 MHz channels.  Another enhancement is the Short Guard Interval ("SGI") which also improves

10   data rate by shortening the gap between symbols.  The 802.11n standard also supports channel

11   coding, which improves the reliability of transmissions.

12          The 802.11n Task Group had multiple modulation technologies to select from to achieve its

13   objective of higher throughput.  IEEE 802.11n considered proposals such as the World-Wide

14   Spectrum Efficiency ("WWISE") proposal, which advocated the use of multiple input multiple

15   output ("MIMO") technology, as well as the TGn Sync proposal, which advocated use of wider

16   spacing.  As frequently occurs in IEEE 802.11 standardization, no proposal could reach the super

17   majority voting level of 75% for standard adoption.  Thus, compromises had to be made.

18   Ultimately, these two proposals merged to form the basis of the 802.11n specification.

19          The 802.11n protocol specifies OFDM modulation, can operate in either the 2.4 or 5 GHz

20   bands, provides data rates of up to 600 Mpbs, and is also backwards compatible with 802.11a, b and

21   g.  As with the 802.11g standard, the modulation functionality in 802.11n was a further move away

22   from the lower performing CCK, which remained as part of the standard only due to backwards

23   compatibility with 802.11b.

24   **D.     Defendants' Patents**

25          **1.     The '958 patent**

26          The '958 patent relates in general to code selection in a digital modulation scheme.

27   Defendants assert the claims of the '958 patent against the CCK modulation technique of the IEEE

28   802.11b specification.  The '958 patent issued on September 17, 2002, from an application filed

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

April 22, 1998. The '958 patent purports to address the problem of increasing data rate in a digital data modulation system. This was not a new problem, and a number of solutions to this problem already existed in the art. Before the filing date of the '958 patent, multiple parties had already submitted proposals to the 802.11b Task Group for alternate modulation technologies. As discussed below, there existed at the time multiple substitutes to the approach claimed in the '958 patent.

### 2.    The '867 patent

The '867 patent generally relates to power saving technology. The '867 patent discloses an apparatus that has "improved synchronization between the transmitters and the receivers" in a network. In particular, this system allows for the "synchronization between the signals transmitted from one station and the activation of the power-consumption state of the receiver station." This means that a receiver in the system may switch its power consumption mode synchronously with signals from a transmitter station, so that the receiver "wakes up" in time to receive a scheduled message intended for that receiver. As with the '958 patent, there existed multiple substitutes to the '867 patented approach, and in any event, the accused functionality in the standard is optional.

### E.    Many Patents Cover The 802.11 Standard

As Judge Robart found in *Microsoft v. Motorola*, there are numerous, possibly thousands, of essential patents to the 802.11 standard. Ninety-two entities have submitted letters of assurance for the various 802.11 amendments. Companies may also provide "blanket" LOAs to the IEEE, which do not identify specific patents. Many large companies have submitted such blanket LOAs. A conservative assumption suggests at least 203 declared standard essential patents and 56 patent applications for the 802.11 standard. Realtek's technical expert, Matthew Shoemake, Ph.D., estimates based on research reports ███████████████████████████████████ ████ Given the large number of patents related to the 802.11 standards, the value of Defendants' '958 and '867 patents would necessarily comprise only a very small fraction of the overall value of the Wi-Fi standard.

### F.    Defendants' Letters of Assurance To The IEEE

Defendants and Lucent Technologies ("Lucent"), Agere's predecessor in interest for the '958 and '867 patents, have submitted LOAs for the 802.11 standard.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  Lucent submitted a letter of assurance to the IEEE on April 29, 1998.  Lucent declared that

2  "if Lucent's proposals are adopted by the IEEE, it will license its issued and pending patents and

3  technology essential to the practice of the 802.11a standard, in accordance with IEEE patent Policy."

4  Lucent also submitted an identically worded letter of assurance for the 802.11b standard.

5  Agere submitted LOAs for the 802.11 standard in January and September of 2003 and

6  September 2004. [3]  Agere's January and September 2003 LOAs identified the '958 and '867 patents

7  (the latter by its application number, U.S. Application No. 10/092,295) as including "one or more

8  claims that may be required to practice" the 802.11e and 802.11g standards.  Further, Agere noted

9  that:

> Agere owns a large portfolio of patents, including a large number of patents in
> the Wireless Local Area Network space, and there may be other patents and
> patent applications in our patent portfolio that are required to meet the
> 802.11g standard in addition to the ones listed below.

13  The LOAs also stated that Agere was "prepared to grant a license to an unrestricted number

14  of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to

15  comply with the [Proposed] IEEE Standard."  Agere's September 2004 LOA, in connection with the

16  802.11n standard, made similar statements, but did not identify specific patents, stating only that

17  they were "unknown."

18  On the basis of these written commitments, this Court found that "[D]efendants are

19  contractually obligated under their Letters of Assurance to the IEEE to license the '958 and '867

20  patents on RAND terms and Realtek is a third-party beneficiary to that contract (this is not

21  disputed)."

22  **G.    Defendants' Breached Their RAND Obligations To The IEEE and Realtek**

23  On October 22, 2002, Agere first contacted Realtek suggesting that Realtek take a license to

24  certain Agere patents, including the '958 patent, allegedly essential to the IEEE 802.11b standard.

25  Agere's letter stated that Agere was "willing to offer Realtek a license to essential claims of Agere

26  patents for implementing the 802.11b standard at a royalty rate of 5.00% on all 802.11b products

---

27  [3] See Order Granting Partial Summary Judgment at 2; see also Letters of Assurance dated September 4, 2003, January
28  24, 2003, and September 13, 2004 [Dkt. No. 67-6].

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

sold by Realtek." On January 24, 2003, Realtek replied, seeking more specific information regarding Agere's infringement contentions. Agere's response of February 5, 2003 suggested a conference call with its patent counsel "to highlight some of the particular claims of the previously referenced Agere patents that [it] believe[d] [we]re relevant to the 802.11b standard." On March 31, 2003, Agere again contacted Realtek to ask "the status of Realtek's analysis and response to Agere's offer to license essential claims relating to the 802.11b standard." The correspondences between the parties apparently ceased after this last communication, and Realtek never took a license.

On March 7, 2012 LSI sent Realtek a letter asserting that certain Realtek products incorporated into third-party devices infringed certain patents, including the '958 and '867 patents, and demanding that Realtek immediately cease and desist from the allegedly infringing activities. This letter did not contain any offer or proposal to license the patents. On March 12, 2012, the Defendants filed a complaint before the International Trade Commission ("ITC") alleging patent infringement and seeking injunctive relief against Realtek.

This Court has held that Defendants, "by instigating an ITC Section 337 action naming Realtek as a respondent prior to offering a RAND license to Realtek, violated their contractual obligations to the IEEE and to Realtek to license their standard-essential patents under RAND terms." Moreover, "the act of seeking injunctive relief (here, at the ITC before proposing a RAND license to Realtek) is inherently inconsistent and a breach of defendants' promise to license the patents on RAND terms." Such conduct was "a clear attempt to gain leverage in future licensing negotiations and is improper."

The Court's holding was based on finding that none of Defendants' letters to Realtek prior to instituting the ITC action constituted RAND offers. Specifically, the Court found that "[t]he 2002 and 2003 correspondences regarding the IEEE 802.11b standard do not amount to a RAND offer for a variety of reasons, including that: (1) the 802.11b standard is neither the standard at issue in the ITC litigation nor is it the subject of the RAND commitments in Agere's Letters of Assurance to the IEEE in the record before the court; (2) the parties ceased communications before any specific offer was ever actually made; and (3) Realtek continued to sell its Wi-Fi/802.11 component parts for almost nine years thereafter without hearing from defendants, implying that defendants were no

1   longer seeking to license their declared standard-essential patents to Realtek." Defendant LSI's

2   March 7, 2012 letter also did not include any offer or proposal to license the patents, but instead

3   demanded Realtek to immediately cease and desist, and Defendants filed the ITC action less than a

4   week later without even waiting for a response.

5         Following the filing of the ITC complaint, Defendants sent Realtek a license proposal on

6   June 20, 2012. The Court has not addressed the reasonableness of this post-litigation license

7   proposal, finding breach in the failure to offer a RAND license prior to filing the ITC action.

8   Although it is Realtek's position that the June 2012 proposal also violates Defendants' RAND

9   obligations ███████████████████████████████████████

10  ██████████████ Realtek has agreed not to pursue this alternate theory of breach in light of the

11  Court's Order granting summary judgment.

### III.   ARGUMENT

### A.   The RAND Rate Proposed By Realtek For The '958 and '867 Patents Should Be Adopted

15        The main purpose of the RAND requirement "is to confine the patentee's royalty demand to

16  the value conferred by the patent itself as distinct from the additional value – the hold-up value –

17  conferred by the patent's being designated as standards-essential." *Apple, Inc. v. Motorola, Inc.*,

18  869 F. Supp. 2d 901, 913 (N.D. Ill. 2012). The RAND requirement also avoids the so-called

19  "royalty stacking" problem, which results when a cumulative royalty for all patents essential to a

20  standard is so high that the standard cannot succeed in the market.

21        The Court should be guided by sound, comparable, market-based evidence that addresses

22  both the "hold up" and "royalty stacking" problems and that therefore provides a reliable foundation

23  for determination of a RAND royalty. Realtek's evidence will do so. In contrast, Defendants'

24  position rests entirely on incomparable licenses, and amounts to a hold-up royalty that bears no

25  relationship to any proper apportionment of the value of Defendants' patents.

### 1.   The Proper Framework For Determining RAND Royalties Requires Avoiding Hold Up And Stacking Errors

28  The proper framework for determining a RAND royalty rate takes both patent hold-up and

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

royalty stacking problems into account.  Judge Robart articulated such a framework in the *Microsoft v. Motorola* case by adopting a modified list of *Georgia-Pacific*[4] factors that a standard-essential patent owner and standard-implementer would consider during a hypothetical negotiation over a reasonable royalty rate to be paid for patents obligated to a RAND commitment.  That list of considerations is as follows:

    1.    The royalties received by the patentee for the licensing of the patents, where the parties clearly understood the RAND obligation, proving or tending to prove an established royalty.

    2.    The rates paid by the licensee for the use of other patents comparable to the defendants patents.

    3.    The nature and scope of the hypothetical license.

    4.    The contribution of the patents to the technical capabilities of the standard and the contribution of those relevant technical capabilities to the implementer and the implementer's products.

    5.    The duration of the patent and term of the license.

    6.    Alternatives to the patented technology that could have been written into the standard instead of the patented technology, focusing on the period before the standard was adopted and implemented.

    7.    The extent to which the licensee has made use of the invention.

    8.    The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses licensing RAND-committed patents to allow for the use of the invention or analogous inventions.

    9.    The opinion testimony of qualified experts.

    10.    The amount that a licensor would have agreed upon (at the time of adopting the standard) if both had been reasonably and voluntarily trying to reach agreement and considered the RAND commitment and its purposes in their efforts to reach a license agreement to ensure widespread adoption of the standard while avoiding holdup and stacking.

---

[4] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

*Microsoft v. Motorola*, No. 10-1823JLR, 2013 WL 2111217, at *16-20 (W.D. Wash. Apr. 25, 2013).

Additional factors Judge Robart considered relevant in determining a RAND rate include the following:

11.   A proper RAND royalty rate should be set at a level consistent with the IEEE's goal of promoting widespread adoption of its standards.

12.   A proper RAND royalty rate should seek to reduce the risk of patent "hold-up," which is the ability of a standard essential patent owner to demand more than the value of its patented technology for that patent.

13.   A proper RAND royalty rate should address the risk of "royalty stacking," which is the payment of excessive royalties to many different standard essential patent owners.

14.   A proper RAND royalty rate should induce the creation of valuable standards by ensuring that owners of valuable patents will receive reasonable royalties for their patents.

15.   A proper RAND royalty rate should be limited to the economic value of the patented technology itself, apart from the value associated with incorporation of the patented technology into the standard.

16.   A proper RAND royalty rate should be demonstrably free of any unfair discrimination towards the party being offered a license.

*Microsoft*, 2013 WL 2111217, at *10-12.

Applying these factors here, a RAND royalty rate for the '867 and '958 patents is minimal, at 0.059 cents per semiconductor device for the two patents, or 0.0295 cents for each of them.

**2.     A RAND Royalty For The '867 and '958 Patents Should Be Minimal Because The Ex-Ante And Aggregate Value Of These Patents, Free From Holdup, Is Close To Zero**

The value of patented technology in a standard cannot be greater than its relative contribution.  Given that the overall value of the 802.11 standard must be divided among all standard essential patent holders, the value of the *average* standard essential patent is necessarily low.  This has important implications for the determination of a RAND royalty rate.  Unless it is shown that a patented technology made significant technical contributions that had no reasonable or viable alternatives, the presumption should be that the value of that patent is low.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

a.   **The ex-ante value of the '958 and '867 patents is at best minimal because good or better alternatives to these technologies existed and the inventive contribution was minimal**

A royalty that reflects the *ex ante* value of the patents, and is therefore consistent with Defendants' RAND obligation, should be based on the incremental value added by use of the technology relative to alternative technologies that could have been adopted.. Such an incremental-value approach, along with a modified *Georgia-Pacific analysis,* was recently used by Judge Robart in *Microsoft Corporation v. Motorola, Inc.* Judge Robart noted that, while certain practical issues arise in its application, an "*ex ante* examination of the incremental contribution of the patented technology to the standard can be helpful in determining a RAND rate in the context of a dispute over a RAND royalty rate." *Microsoft,* at *13. In particular, Judge Robart found that:

> [A] reasonable royalty rate for an SEP committed to a RAND obligation must value the patented technology itself, which necessarily requires considering the importance and contribution of the patent to the standard. If alternatives available to the patented technology would have provided the same or similar technical contribution to the standard, the actual value provided by the patented technology is its incremental contribution. Thus, comparison of the patented technology to the alternatives that the SSO could have written into the standard is a consideration in determining a RAND royalty. *Id.*

The economic assessment of the *ex-ante* value of a patent requires two steps. It first requires evaluating the technical benefits brought by the patented technology to the standard, if any, over non-infringing alternatives. The second step of the assessment requires translating the technical benefits, if any, of the '867 and '958 patents into the incremental economic value, if any, that was created by their purported inclusion into the 802.11 standard.

Here, as a threshold matter, a quantitative analysis shows that the '958 and '867 patents necessarily comprise, at best, a small fraction of the overall value of the 802.11 standard. As noted, there are estimated to be over 3,000 patents related to the 802.11 standard. Moreover, the IEEE 802.11–2012 specification (the first complete version of the standard to incorporate the IEEE 802.11n amendment, which includes the backwards-compatible sections on CCK and power save technologies that Defendants claim are covered by the '958 and '867 patents, respectively) includes very little discussion of either of those technologies.[5]  Finally, based on the number of LOAs

---

[5]  Indeed, even assuming that all aspects of CCK functionality are attributable to the '958 patent, only 2.1 of 2,793 pages

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  submitted to the IEEE for the 802.11 standard, a conservative estimate is that there are at least 203

2  declared standard essential patents and 46 patent applications for the 802.11 standard.  Thus, at best,

3  Defendants' patents represent only a tiny fraction of the 802.11 standard essential patents and do not

4  represent a significant portion of the overall value of the 802.11 standard.

5       More importantly, a more detailed analysis of the technologies in the '958 and '867 patents

6  shows they should be accorded *lower* than average value as compared to the hundreds of other

7  technologies essential to the 802.11 standard.  Specifically, for both the '867 and '958 patents,

8  multiple alternatives to the patented technologies were available at the time of standards adoption.

9  Thus, the claimed inventions of the asserted patents represent minor, incremental contributions, if

10 any, to the standard and should be accorded little or no value.

11             i.      **The ex-ante value of the '958 patent is low because many**
                      **alternatives, including at least one with better performance, were**
12                    **available at the time 802.11b was being developed**

13      Defendants have accused implementation of the CCK modulation technique as infringing the

14 '958 patent.  However, as noted, the CCK modulation technique was adopted in the 802.11b

15 specification only as a compromise, over five alternative technologies, for market-related reasons.

16 Alternative technologies not only existed, but they were the subject of specific proposals to the

17 IEEE.  Had the 802.11 Working Group known that Defendants would threaten adopters of infringing

18 with injunctions, excessive royalty demands and discriminatory preferences in licenses practices, it

19 could have adopted alternative technologies to the alleged invention of the '958 patent.

20      Each of these other technologies would be non-infringing alternatives, including because

21 they were not based on grouping information bits and/or did not use complimentary codes.[6]  QAM

22 modulation, with its binary convolutional codes, and which was included in the 802.11a

23 specification, also does not practice the '958 patent.

24      Moreover, CCK was not the highest performance technology adopted into the IEEE 802.11b

25 (or 0.075 percent) of the specification include any discussion of CCK functionality.  Further, assuming that all
synchronization functionality (broadly speaking, the aspect of power save technology purportedly related to the '867
26 patent) is attributable to the '867 patent, only 2.7 of 2,793 pages (or 0.10 percent) of the specification actually includes
discussion of that functionality.
27 [6] The binary convolutional coding of PBCC does not use complimentary codes and is not based on the grouping of
information bits that appear to be required by the '958 patent. The other techniques did not use complimentary codes.
28

specification.  A commenter in March 1999 proposed making PBCC a mandatory modulation mode because "CCK modulation is inherently very weak by today's communications standards."  Instead, the 802.11b task group adopted PBCC as a high performance option for the 802.11b specification. QAM modulation was also considered a more advanced technology.

Even when considering the accused CCK functionality, there are numerous technologies that contribute to CCK.  For example, bit mapping, bias suppression, differential coding, symbol mapping, modulation indication, rate indication, and packet size (MPDU) calculation are all technologies that contribute to CCK.  The '958 patent relates to a claimed method of code selection, which, at most, is only one aspect of CCK technology.

Additionally, it should be noted that implementing a receiver for CCK requires an equalizer. Such an equalizer is difficult to build, but is key to the performance of CCK.  The equalizer must be present to deal with the negative effects of multipath in the channel.  Given the elementary nature of CCK as a modulation technique, it is likely that development of channel equalizers independently by each Wi-Fi chip manufacturer to correct for multipath was a more important contributor to the performance of CCK than the CCK technology itself.

   ii.  **The ex-ante value of the '867 patent is low because alternatives existed at the time 802.11b was being developed and it related to an optional feature relevant only to certain Wi-Fi products**

Like the '958 patent, the value of the '867 patent is low because alternatives could have been implemented in its place.  The '867 patent relates to power saving technology, and centers around the synchronization of the receiver and a transmitter so as to save power.  As a preliminary matter, the value of the '867 patent is low because it relates to a peripheral feature that would be relevant to only a subset of devices.  The importance of power saving features is limited to devices with small batteries such as mobile phones.

Power savings features are not core functionalities.  Power savings mode in the 802.11 standard is in fact optional, in that the implementer is not mandated to include them.  Weighed against core functionalities of the 802.11 standard, power saving features are inherently of lesser value and in some cases of no value at all.

1    In addition, based on alternative non-infringing technologies that could have been adopted,

2  the technical benefits associated with the '867 patent are low.  All of the asserted independent claims

3  of the '867 patent require "a timestamp having a value m for synchronizing a timer with a transmit

4  timer."  The power saving mechanism of the '867 patent is dependent upon synchronization of the

5  receiver with the transmitter and on the receiver "waking up" at specific times to receive traffic

6  indication messages (TIM).  Therefore, one non-infringing alternative could be achieved by allowing

7  the power saving device to determine its own time to wake.  Upon waking, the device could poll the

8  access point to determine if traffic is available.

9    Another non-infringing alternative that achieves power savings is to use a time division

10  multiple access (TDMA) MAC protocol.  TDMA technology was well-known at the time of

11  development of the 802.11 standard, e.g., widely used in cellular networks.  By using TDMA, the

12  device could sleep during time periods that are not allocated to it.  TDMA avoids the use a TIM,

13  thereby avoiding infringement of the '867 patent.

14    Finally, another non-infringing alternative is to not use power save mode at all, because

15  power save mode is not necessary for communication between 802.11-compatible products.

16    The 802.11 Working Group could have adopted any of these alternative technologies to the

17  alleged invention of the '867 patent, had it known that Defendants would threaten injunctions,

18  excessive royalty demands and discriminatory license practices based upon a purely optional feature.

19    Moreover, various other technologies contribute to the power save mode, aside from what is

20  allegedly claimed by the '867 patent.  For example, the standard itself contains beacon structure,

21  network topology and scanning technologies that are key to power saving and synchronization but

22  are not topics of the '867 patent.  Further, the standard is silent on certain power saving related

23  technologies that in practice are more important than the synchronization technology of the '867

24  patent and the 802.11 standard itself.  Namely, achieving low power operation is left to the

25  implementer.  Thus, companies such as Realtek must develop or use low power CMOS, clocking

26  architectures, oscillator and crystal, data buffering and queuing, power amplifier and regulator

27  technologies to enable their Wi-Fi chips to actually consume little power while in low power states,

28  as the 802.11 standard is silent on the topic.  The '867 patent relates to a claimed method of

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   improved synchronization which, at most, is only one aspect of power saving and synchronization

2   technology as used in the 802.11 products.

3       **3.      The** [REDACTED] **Provides The Most Reliable Benchmark For A
       RAND Royalty For The '958 And '867 Patents.**



24  Defendants' damages expert, Gregory Leonard, Ph.D., [REDACTED]

REED SMITH LLP
A limited liability partnership formed in the State of Delaware



Dr. Leonard ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████

A RAND royalty at this level is further supported by Judge Robart's RAND findings in *Microsoft v. Motorola.* ████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████ The evidence in this case is consistent with the use of the lower rate set by Judge Robart.

Consideration of the *Georgia-Pacific* factors indicates that the outcome of the hypothetical negotiation would have been pushed toward the lower end of the bargaining range. In particular, neither the '867 nor the '958 patent represented significant technical contributions to the 802.11 standard, and alternative technologies were considered at the time the 802.11b standard was being developed. The availability of such alternatives means that the *ex-ante* value of the '867 and '958 patents was low and that a licensee would not pay more than a nominal amount for these patents.

**4. Defendants' Proposed** ████████████████████████ **For The '958 and '867 Patents Is Not A RAND Royalty**

Defendants' damages expert, Dr. Anne Layne-Farrar, has opined ██████████████████

████████████████████████████████████████████████████

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1

2

3

4

5

6 However, Defendants' and Dr. Layne-Farrar's

7

8      a.     The

9 A

10

11

12

13

14

15

16

17

18

19

20

21

22

23      b.     **Defendants' Damages Expert**

24 In the *Microsoft* case, Judge Robart's opinion setting a RAND rate discussed numerous flaws

25 inherent in the Via Pool. Via Licensing formed its 802.11-essential patent pool between 2003 and

26 2005. *See Microsoft*, 2013 WL 2111217, at *87. Participation in the pool is substantially lower than

27 other patent pools, as it includes only five licensors and 35 worldwide patents allegedly essential to

28

PLAINTIFF REALTEK SEMICONDUCTOR CORPORATION'S TRIAL BRIEF

1  the 802.11 standard. *Id.* The Via Pool has rates that vary from $0.05 to $0.55 per unit, depending on

2  volume. *Id.* at *88.

3       Among other things, Judge Robart emphasized that the Via Pool had not been very

4  successful in attracting licensors or licensees. *Id.*, at *89. The vast majority of companies that own

5  SEPs for the 802.11 standard, such as Motorola and Microsoft, have not joined the Via Pool as

6  licensors. *Id.* Given the poor participation in the pool, it has not achieved a primary purpose of

7  RAND commitments – to encourage widespread adoption of the 802.11 standard – and thus has

8  lower relevance as an indicator of a RAND rate. *Id.* Thus, as Dr. Layne-Farrar acknowledged in her

9  report,

10

11       Dr. Layne-Farrar engages in a three-part analysis to rely on the Via Pool. Each step of the

12  analysis is flawed, and the overall methodology is unsound and unreliable.[7]

13

14

15

16

17

18  Second,

19

20

21

22

23

24

25  Third,

26

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

28  [7] By separate *Daubert* motion, Plaintiff Realtek seeks to exclude Dr. Layne-Ferrar's testimony concerning the Via Pool.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1 ██████████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████████

3 ██████████████████████████████████████████████████████████

4 ██████████████████████████████████████████████████████████

5 ████████████████

6    In sum, Dr. Layne-Farrar mixes and matches inconsistent methodologies, and thereby

7 accomplishes inaccurate and unreliable results. ██████████████████████████████████

8 ██████████████████████████████████████████████████████████

9 ███████████████████████████    In short, the Via Pool is a poor benchmark made worse by Dr.

10 Layne-Farrar's flawed methodology.

11 **B.    Realtek Should Be Awarded All Of Its Attorney's Fees And Costs Associated With The**
   **ITC Action Filed By Defendants In Breach Of Their RAND Obligations**

12    The Court has already determined that Defendants breached their contractual obligation to

13 the IEEE and to Realtek as a third-party beneficiary of that contract by seeking injunctive relief

14 against Realtek in the ITC before offering Realtek a license. [*See* Dkt. No. 102, at 11.]  Realtek is

15 claiming its attorneys' fees and costs incurred in the ITC action as its damages proximately caused

16 by this breach.  Realtek produced portions of invoices through July 8, 2013 that showed the amount

17 of Realtek's attorneys' fees and costs incurred through May 31, 2013 in the ITC action,[8] and

18 Realtek's damages expert, Dr. Greg Leonard, opined that such amounts, ████████████████

19 were suffered as damages by Realtek.  Recently, Realtek produced further invoices, bringing the

20 total fees and costs incurred by Realtek in the ITC action to date to ███████████

21    **1.    Defendants' Expert** ████████████████████████████████

22    Notably, Dr. Layne-Farrar, ██████████████████████████████████████████

23 ██████████████████████████████████████████████████████████

24 ██████████████████████████████████████████████████████████

25 ██████████████████████████████████████████████████████████

26 ████████████████

27 ————————————————————

28 [8] A March 10, 2013 was inadvertently omitted but has now been produced to Defendants.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

2. **Defendants' "Mitigation" Defense Is Legally And Factually Unsound**

On the eve of pretrial preparations, Defendants advanced a new "theory" that Defendants' June 2012 proposal created a duty on Realtek to respond in some undefined manner or else be found to have failed to mitigate its damages. This theory is legally and factually unsound, and Realtek has moved to exclude it at trial.

First, and fundamentally, the June 2012 proposal is not relevant to Defendants' purported mitigation defense, because Realtek's response to the proposal (or alleged lack thereof) could not evidence a failure to mitigate as a matter of law and common sense. The Court has already decided that Defendants breached their agreement to license on RAND terms by filing the ITC action before making any licensing offer to Realtek. [Dkt. No. 102, at 11.] The Court also found that by filing the ITC action, Defendants created undue leverage and placed Realtek at a bargaining disadvantage, because Realtek would have been forced to negotiate with the threat of an injunction hanging over its head. [*Id.*, at 10-11, 13.] As a result, a fair negotiation could not have taken place unless and until Defendants withdrew their ITC investigation against Realtek.

Because Defendants did not withdraw (and still have not withdrawn) the ITC action and corresponding threat of an injunction, Defendants' breach was a continuing breach that continued to create an *inherently unfair* negotiating environment. Realtek cannot be said to have "failed to mitigate" by refusing to negotiate an inherently unfair proposal under the duress of an injunctive threat. Put simply, refusing to do something unfair or unreasonable does *not* constitute a failure to mitigate. *See Valle de Oro Bank*, 26 Cal. App. 4th 1686, 1691 (1994) (duty to mitigate damages does not require an injured party to do "what is unreasonable or impracticable," or to "sacrifice and surrender important and valuable rights"). Likewise, no duty to mitigate would require Realtek to relinquish its right to defend itself in the ITC – particularly against an action that was wrongfully brought in the first instance. *See id.* In short, Realtek's response to June 2012 proposal is not relevant to the issue of mitigation. *See* Fed. R. Evid. 401- 402.

Second, none of Defendants' experts ████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

1 ████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████████

5     Finally, Defendants' own discovery conduct should preclude them from relying on the June

6 2012 proposal for their mitigation defense.  During discovery, Defendants did not identify any fact

7 witnesses in their Initial Disclosures with knowledge of this new theory that the June 2012 proposal

8 somehow mitigated the damages resulting from their breach of contract, nor did they make any such

9 fact witnesses known to Realtek during the discovery process or in writing, such that Realtek could

10 have pursued these issues during discovery.  See Fed. R. Civ. Proc. 26(e).  To the contrary,

11 Defendants steadfastly denied breaching their RAND obligations in the first instance, and thus never

12 proffered (until now) their alternate theory that the June 2012 proposal somehow mitigated (or

13 cured) that breach.  Having failed to provide discovery on these issues, Defendants should be

14 precluded from pursuing the issues at trial.   Fed. R. Civ. Proc. 37(c) ("If a party fails to provide

15 information . . . as required by  Rule 26(a) or (e), the party is not allowed to use that information . . .

16 at a trial, unless the failure was substantially justified or was harmless.")

17     In any event, even if the June 2012 proposal were somehow relevant given the current

18 posture of this case, █████████████████████████████████████████████████

19 ████████████████████████████████████████████████████████████

20 ███████████████████████████████████

21 **C.    Realtek Is Entitled To A Permanent Injunction**

22     In connection with its summary judgment ruling, this Court imposed a preliminary injunction

23 barring Defendants from enforcing, or seeking to enforce, any exclusion order or injunction that

24 Defendants might obtain with respect to the alleged standard-essential patents until this Court

25 determines Defendant's RAND obligations and Defendants have made a RAND offer to Realtek

26 consistent with the Court's determination.  [*See* Dkt. No. 102 at 11, 14.]  The Court found that

27 Realtek was suffering irreparable harm to its customer relationships and reputation, and that

28 irreparable harm is ongoing.  The same facts supporting imposing the preliminary injunction on

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  Defendants thus support a permanent injunction barring Defendants from enforcing, or seeking to

2  enforce, any exclusion order or injunction that Defendants might obtain with regard to the '958 and

3  '856 patents until Defendants have made a RAND offer to Realtek consistent with the RAND

4  royalty determined at trial.

5      A patent holder is entitled to a permanent injunction if it establishes that: (1) it has suffered

6  an irreparable injury; (2) remedies available at law are inadequate to compensate for that injury; (3)

7  considering the balance of hardships between the plaintiff and defendant, a remedy in equity is

8  warranted; and (4) the public interest would not be disserved by a permanent injunction.  *eBay Inc.*

9  *v. MercExchange, L.L.C.*, 547 U.S. 388, 391, (2006); *see also  Douglas Dynamics, LLC v. Buyers*

10  *Products Co.*, 717 F.3d 1336, 1344-1345 (Fed. Cir. 2013).  Realtek meets all of these elements.

11      **1.      Likelihood of Irreparable Harm**

12      This Court has already found that the threat of an exclusion order has harmed Realtek's

13  reputation and posed an imminent threat of customer and revenue loss.  This threat has not

14  dissipated, and thus the likelihood of irreparable harm likewise remains the same.

15      **2.      Remedies At Law Are Inadequate**

16      An award of additional damages would be inadequate to compensate Realtek for the harm to

17  its reputation, and customer and revenue loss.   Because damages will not compensate the harm

18  suffered by Realtek due to loss of market share, a permanent injunction is appropriate.

19      **3.      Balancing of Equities**

20      The balancing of equities also weighs in favor of a permanent injunction.  The continuing

21  threat of enforcement of an exclusion order would result in Realtek (1) losing its customers who sell,

22  use, or import Realtek's component parts into the United States, and/or (2) being forced to negotiate

23  a license in the disadvantaged position of having an exclusion order hanging over its head.  [*See* Dkt.

24  No. 102 at 13.]  By contrast, Defendants would suffer no harm from a permanent injunction that

25  merely required them to satisfy their RAND obligations by making a RAND offer, pursuant to the

26  royalty determined at trial in this action, prior to enforcing any exclusion order.

27      **4.      Public Interest**

28      A permanent injunction also serves the public interest by "mak[ing] clear that commitments

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

to make patents available on reasonable terms matter."  Opening Remarks of Federal Trade Commission ("FTC") Chairman Jon Leibowitz as Prepared for Delivery in *In the Matter of Motorola Mobility LLC, a limited liability company, and Google, Inc., a corporation*, FTC File No. 121-0120 (Jan. 3, 2013) [Dkt. No. 68-2] at 3.  A permanent injunction would prevent any interruption in the availability of the alleged standards-essential patents, and allow Realtek's customers of its Wi-Fi component parts to continue to conduct business as usual.  It is also consistent with Defendants' RAND commitment.

## IV.   CONCLUSION

Realtek's proposed royalties are RAND and Defendants' are not.  Further, Realtek is entitled to recover all its attorney's fees and costs incurred in the ITC action Defendants filed in breach of their RAND obligations.  Finally, Realtek is entitled to a permanent injunction barring Defendants from enforcing, or seeking to enforce, any exclusion order or injunction that Defendants might obtain with respect to the alleged standard-essential patents until Defendants have made a RAND offer to Realtek consistent with the Court's determination of the proper RAND rate.

DATED:  September 26, 2013.

Respectfully Submitted,

REED SMITH LLP

By____/s/ *William R. Overend*_____
William R. Overend
Attorney for Plaintiff
REALTEK SEMICONDUCTOR CORPORATION

REED SMITH LLP
A limited liability partnership formed in the State of Delaware