Scott D. Baker (SBN 84923)
Email: sbaker@reedsmith.com
William R. Overend (SBN 180209)
Email: woverend@reedsmith.com
Adrian Sue Shin (SBN 256960)
Email: sshin@reedsmith.com
James A. Daire (SBN 239637)
Email: jdaire@reedsmith.com
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105-3659
Telephone: (415) 543-8700
Facsimile: (415) 391-8269

Steven S. Baik (SBN 184622)
Email: sbaik@reedsmith.com
Carina M. Tan (SBN 185015)
carinatan@reedsmith.com
REED SMITH LLP
1510 Page Mill Road, Suite 110
Palo Alto, CA 94304
Tel: (650) 352-0500
Fax: (650) 352-0699

Attorneys for Plaintiff
REALTEK SEMICONDUCTOR CORPORATION

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

REALTEK SEMICONDUCTOR CORPORATION,

Plaintiff,

vs.

LSI CORPORATION and AGERE SYSTEMS LLC,

Defendants.

Case No. 5:12-cv-03451 RMW

**PLAINTIFF REALTEK SEMICONDUCTOR CORPORATION'S OPPOSITION TO DEFENDANTS' MOTIONS *IN LIMINE* AND *DAUBERT* MOTIONS**

Date: October 17, 2013
Time: 2:00 p.m.
Place: Courtroom 6, 4th Floor

Trial Date: November 4, 2013

Hon. Ronald M. Whyte

## TABLE OF CONTENTS

Page


I . INTRODUCTION ....... 1

II . OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 1 ....... 1

III . OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 2 ....... 1

A. Dr. Leonard's Microsoft Rate Analysis Is Both Relevant And Admissible ....... 2

B. *Dynetix* And *Uniloc* Support The Admissibility Of Dr. Leonard's *Microsoft* Rate Analysis ....... 5

C. Defendants Have Failed To Articulate Any Prejudice That Would Result From Admission Of Dr. Leonard's Testimony Concerning The Microsoft Rate ....... 7

IV . OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 3 ....... 7

A. Background ....... 8

B. Argument ....... 10

V . OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 4 ....... 12

A. Factual Background ....... 13

B. Legal Analysis ....... 14

1. Legal Standard ....... 14

2. Dr. Leonard's Opinions Regarding Realtek's Damages Are Properly Within His Specialized Knowledge As An Economist ....... 15

3. Defendants Are Incorrect In Urging The Court To Place The Burden On Realtek To Prove The Reasonableness Of Its Fees-As-Damages ....... 18

4. Realtek Is Not Using The Attorney-Client Privilege As A "Sword And Shield" ....... 20

5. Realtek's Legal Invoices From The ITC Proceeding Were Appropriately Redacted And Are Admissible To Prove Damages ....... 22


REED SMITH LLP
A limited liability partnership formed in the State of Delaware

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aerojet–General Corp. v. Transport Indem. Co.*, 17 Cal.4th 38 (1997) ........ 19

*Arnold v. Ambulance Serv. of Bristol, Inc.*, No. 2:06-CV-105, 2007 WL 5117409 (E.D. Tenn. Aug. 21, 2007) ........ 16

*California v. Pacific Indemnity Co.*, 63 Cal. App. 4th 1535 (1998) ........ 19

*Clarke v. American Commerce National Bank*, 974 F.2d 127 (9th Cir. 1992) ........ 21, 22

*Concept Enterprises, Inc. v. Hartford Ins. Co. of the Midwest*, 2001 WL 34050685 (C.D. Cal. May 22, 2001) ........ 19

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ........ passim

*Feld v. Heeter*, 2008 WL 2982015 (N.D. Cal. 2008) ........ 19

*Forklifts of St. Louis, Inc. v. Komatsu Forklift, USA, Inc.*, 178 F.3d 1030 (8th Cir. 1999) ........ 16

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y. 1970) ........ 3, 6

*In re Grand Jury Witness (Salas and Waxman)*, 695 F.2d 359 (9th Cir. 1982) ........ 21

*In re Prempro Prods. Liab. Litig.*, 514 F.3d 825 (8th Cir. 2008) ........ 15

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) ........ 14, 15

*Maiz v. Virani*, 253 F.3d 641 (11th Cir. 2001) ........ 15

*Mformation Techns., Inc. v. Research in Motion Ltd.*, No. C 08-04990 JW, 2012 WL 1142537 (N.D. Cal. March 29, 2012) ........ 6

*Microsoft Corp. v. Motorola, Inc.*, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013) ........ passim

*Pipitone v. Biomatrix, Inc.*, 288 F.3d 239 (5th Cir. 2002) ........ 15

*Quad/Graphics, Inc. v. One2One Commc'ns*, LLC, 09–CV–99–JPS, 2011 WL 4478440 (E.D. Wis. Sept. 23, 2011) ........ 16, 17

*SEC v. Amazon Natural Treasures, Inc.*, 132 F. App'x 701 (9th Cir. 2005) ........ 18

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011) ........ 2, 5

*United States v. Jennings*, 724 F.2d 436 (5th Cir. 1984) ........ 18

*Valle De Oro Bank v. Gamboa*,
26 Cal.App.4th 1686 (1994) .......... 10, 11

*Wall Data Inc. v. L.A. County Sheriff's Dep't*,
447 F.3d 769 (9th Cir. 2006) .......... 18

*Watkins v. Telsmith, Inc.*,
121 F.3d 984 (5th Cir. 1997) .......... 15

*WWP, Inc. v. Wounded Warriors Family Support, Inc.*,
628 F.3d 1032 (8th Cir. 2011) .......... 15, 16, 17

*Zanker Development Co. v. Cogito Systems Corp.*,
215 Cal.App.3d 1377 (2002) .......... 10

**Statutes**

Cal. Civ. Code § 3300 .......... 20

**Rules**

Fed. R. Civ. Proc. 26 .......... 11

Fed. R. Civ. Proc. 37(c) .......... 11

Fed. R. Evid. 403 .......... 10

Fed. R. Evid. 702 .......... 14

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## I. INTRODUCTION

Plaintiff Realtek Semiconductor Corporation ("Realtek") files the following oppositions to the motions in limine and Daubert motions filed by Defendants LSI Corporation and Agere Systems LLC (collectively, "Defendants"). The background, relevant law and argument in opposition to each of Defendants' motions are set forth below.

## II. OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 1

For the reasons more fully set forth in the parties' Joint Submission Pursuant to Supplemental Case Management Order filed September 11, 2013, Realtek continues to assert that the ITC's Initial Determination that Realtek does not infringe the '958 and '867 patents is relevant and admissible at trial. In setting the RAND rate, the court must consider the technical contributions (or lack thereof) of a patent to a standard, and the need for the standard implementer to infringe the patents in order to practice the standard. *Microsoft Corp. v. Motorola, Inc.*, 2013 WL 2111217, at *18 (W.D. Wash. Apr. 25, 2013) (controversy over infringement was relevant to how parties would view technical contribution of patent to 802.11 standard). A finding – like the one made by the ITC -- that a party practicing that standard did *not* infringe the patent would certainly be a relevant data point in assessing the value of that technical contribution. *Id.*

However, recently, the Court tentatively ruled that while the ITC's preliminary non-infringement determinations could be relevant, the potential prejudice from their admission far outweighs their probative value. Thus, the Court ruled that such determinations are inadmissible at trial. [Dkt. 167, p. 5] In light of that ruling, Defendants' Motion in Limine No. 1 appears to be moot. However, Realtek reserves the right to present such evidence if Defendants open the door to it at trial. For instance, if Defendants argue that Realtek's attorney's fees associated with the ITC case are unreasonable, Realtek should be allowed to proffer evidence of its success in the ITC to rebut that argument. Moreover, if Defendants argue that the '958 and '867 are essential to the 802.11 standard, then Realtek should be allowed to offer evidence that its products that are compatible with the standard nonetheless do not infringe those patents.

## III. OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 2

Defendants' motion to exclude Dr. Leonard's testimony concerning the RAND rate

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

determined by Judge Robart in the *Microsoft v. Motorola* case should be denied because contrary to Defendants' assertions, Dr. Leonard did not choose the *Microsoft* rate as "an arbitrary starting point" for his RAND rate analysis. Instead, Dr. Leonard conducted a thorough analysis of an appropriate RAND rate for the '958 and '867 patents as tailored to the specific facts of this particular case, and then used a comparable rate under Judge Robart's *Microsoft* RAND determination as a benchmark for the RAND rate for the '958 and '867 patents. Dr. Leonard's use of the *Microsoft* rate as a reasonable benchmark comparable is warranted because the patents at issue in this case – similar to the patents in *Motorola*, as determined by Judge Robart – are of little value to the 802.11 standard in light of good or better available alternatives to the patented technology. Indeed, Judge Holderman of the Northern District of Illinois also recently relied on the *Microsoft* rate as a benchmark comparable in his RAND rate determination in the *In re Innovatio IP Ventures, LLC Patent Litigation* cases. [Declaration of William R. Overend ("Overend Decl."), Exh. A (*Innovatio* RAND decision), at 86-87.]

Contrary to Defendants' assertions, use of the *Microsoft* rate is nothing like the one-size-fits-all "rule of thumb" methodologies excluded in *Dynetix Design Solutions, Inc. v Synopsys, Inc.*, No. C 11-05973 PSG, 2012 WL 4538210, at *4 (N.D. Cal. Aug. 22, 2013) and *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011). Because Defendants' objections to Dr. Leonard's analysis go to the weight of his opinions, not their admissibility, and can more than adequately be addressed through cross-examination, Defendants' motion should be denied.

**A. Dr. Leonard's Microsoft Rate Analysis Is Both Relevant And Admissible**

Defendants suggest that Dr. Leonard's RAND rate determination sprang primarily from the *Microsoft* rate determined by Judge Robart. Defendants also assert that Dr. Leonard "makes no effort" to demonstrate why the *Microsoft* rate serves as a reasonable comparable. Defendants are wrong on both counts.

Dr. Leonard's expert report does not rely on the *Microsoft* rate as any sort of starting point for his analysis. Instead, he analyzes an appropriate RAND rate for the '958 and '867 patents based on the comprehensive methodology used by Judge Robart. [*See, e.g.*, Dkt. No. 175, Exh. A (Leonard report), at ¶¶ 34-36, 150-183.] Dr. Leonard applies Judge Robart's modified set of factors

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

from *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y. 1970) and analyzes, among other factors, the *ex ante* value of the '958 and '867 patents to the 802.11 standard in light of available alternatives. Dr. Leonard concludes that the *ex ante* value of both patents is close to zero because (1) the patents represent only a tiny fraction of all patents necessary to implement 802.11 standards; (2) for the '958 patent, multiple alternate proposals for the allegedly patented CCK modulation technology were explicitly considered and voted on by the 802.11 Working Groups during the development of 802.11b, the alleged technology of the '958 did not even represent the highest performance option available, and various other technologies contributed to CCK beyond what is purportedly claimed by the '958 patent; (3) for the '867 patent, the asserted technology related, at best, to an optional part of the 802.11b standard, could have been easily replaced by alternative technologies, and was one of various technologies that contribute to the allegedly infringing power save mode. [*See* Dkt. No. 175, Exh. A (Leonard report), at ¶¶ 29-47.]

As Judge Robart did, Dr. Leonard also analyzes comparable royalty rates, including [REDACTED] and the *Microsoft* rate. [*See id.*, Exh. A (Leonard report), at ¶¶ 114-123, 146-149, 174-181.] But in analyzing the *Microsoft* rate, Dr. Leonard does not choose it as "an arbitrary starting point" for his determination of a RAND rate, as claimed by Defendants. Rather, the starting point for Dr. Leonard's analysis was a comprehensive analysis of all of the modified *Georgia-Pacific* factors as outlined by Judge Robart. Further, there is nothing "arbitrary" about Dr. Leonard's use of the *Microsoft* rate as a benchmark. Dr. Leonard's analysis shows that the economic evidence demonstrates that the *ex ante* value of the '958 and '867 patents is close to zero. [*Id.*, Exh. A (Leonard report), at ¶ 36.] The *Microsoft* rate is therefore a relevant comparable to use as a benchmark because in *Microsoft*, Judge Robart similarly determined Motorola's 802.11 standard essential patents were of minimal *ex ante* value. *Microsoft Corp. v. Motorola, Inc.*, 2013 WL 2111217 at *92 (Motorola's patents used in the Xbox "provide[] very minimal technical contribution to the identified portions of the 802.11 Standard. Additionally, the record was clear that Motorola did not provide the inventive technology in any area of the 802.11 Standard, but instead built upon already existing technology"). In fact, Dr. Leonard's analysis of the *Microsoft* rate as a comparable is conservative, given the near zero *ex ante* value of the '958 and '867 patents as compared to the

value, albeit minimal, that Judge Robart attributed to the Motorola patents. Moreover, LSI's own expert, Dr. Anne Layne-Farrar, [REDACTED][1] [Overend Decl., Exh. B (Layne-Farrar report), ¶120(c).] Because Dr. Leonard's application of the *Microsoft* rate is based on his demonstration that the *Microsoft* rate is comparable given the low *ex ante* value of the '958 and '867 patents to the 802.11 standard, the *Microsoft* rate is relevant and admissible as a RAND rate benchmark.

Dr. Leonard's apportionment down to the two patents-in-suit is also based on the specific facts of this case. Dr. Leonard specifically analyzed the value of the '958 and '867 patents, and concluded that there was no evidence that the '958 and '867 patents are more valuable than the Motorola 802.11 standard essential patents that Judge Robart addressed in *Microsoft*. [*See* Dkt. No. 175, Exh. A (Leonard report), at ¶¶ 121-123.] Judge Robart's RAND rate was calculated under the assumption that Motorola owned 24 essential patents to the 802.11 standards. Dr. Leonard determined a combined RAND rate for the '867 and '958 patents would be 1/12th of the RAND rate for the Motorola patent portfolio (that is, two patents divided by Motorola's 24 patents). Given the minimal contribution of the '958 and '867 patents to the 802.11 standard, Dr. Leonard's calculation was conservative, because it set the value of these patents equal to the average value of the Motorola standard essential patents. [*See id.*] Notably, Defendants' own damages expert, Dr. Layne-Farrar, [REDACTED] [Overend Decl., Exh. B (Layne-Farrar Report), ¶¶ 137-141].

Defendants seem to suggest that because Motorola's patents are not at issue in this case, the *Microsoft* rate cannot be relied on as a comparable. But Defendants' own damages expert, Dr. Layne-Farrar, relies on [REDACTED]

---

1 Realtek has filed a *Daubert* motion challenging Dr. Layne-Farrar's flawed use of this patent citation analysis in her report. [Dkt. 179.]



REED SMITH LLP
A limited liability partnership formed in the State of Delaware

███████████████████████████████
████████████ [2] Judge Robart also relied on the Via Pool, even though the Via Pool did not include the patents at issue in the *Microsoft* case.

The *Microsoft* rate is not some arbitrary starting point for Dr. Leonard's opinion. It instead serves as a relevant benchmark where, as here, the *ex ante* of the '958 and '867 patents is even lower than that of the patents in *Microsoft*.[3]

### B. *Dynetix* And *Uniloc* Support The Admissibility Of Dr. Leonard's *Microsoft* Rate Analysis

The cases Defendants rely on – *Dynetix*, 2012 WL 4538210 and *Uniloc*, 632 F.3d 1292 – actually support the admissibility of Dr. Leonard's reliance on the *Microsoft* rate, because both cases recognize that comparable royalty rates, like the *Microsoft* rate, are relevant and admissible. For example, in *Uniloc*, the court rejected application of the so-called "25 percent rule of thumb," a methodology used to approximate the reasonable royalty rate that the manufacturer of a patented product would be willing to offer to pay the patentee during a hypothetical negotiation. The rule suggests that the licensee pay a royalty rate equivalent to 25 percent of its expected profits for the product that incorporates the intellectual property at issue. *Uniloc*, 632 F.3d at 1312. The Federal Circuit found that use of the 25% rule of thumb by the patentee's damages expert was arbitrary because it was not based "on other licenses involving the patent at issue *or comparable licenses*." *Id.* at 1318 (emphasis added). Here, by contrast, the *Microsoft* rate is not an arbitrary rule of thumb but is itself a comparable royalty rate, as confirmed by Judge Holderman's opinion in *Innovatio*. Thus, *Uniloc*, which recognizes comparables as relevant, actually *supports* admitting Dr. Leonard's analysis of the *Microsoft* rate.

*Dynetix* also does not support Defendants' argument. *Dynetix* involved another "rule of

---

[2] As noted, Realtek has filed a *Daubert* motion challenging Dr. Layne-Farrar's methodology in relying on ████████████. [Dkt. 179.]

[3] Indeed, Dr. Layne-Farrar's analysis actually *corroborates* the use of the *Microsoft* rate as a comparable, because █████████████████████████

thumb" methodology similar to the 25 percent rule. The patentee's damages expert used as a "starting point" for his reasonable royalty analysis "half of the gross margin of the infringing products." *Dynetix*, 2013 WL 4538210 at *1. From there, he applied the *Georgia-Pacific* factors and made a determination of a royalty rate. The court rejected this arbitrary starting point as impermissible under *Uniloc*, because it was not tied to the facts of the case and instead was based on the expert's "own experience and judgment on how to apportion profit between the licensee and licensor where there is *no other information to slant the apportionment one way or another*." *Id.* at *4 (emphasis in original). The court found that the expert's 50% starting point was "even more arbitrary than the 25% starting place rejected by the Federal Circuit" in *Uniloc*. *Id.*

Here, by contrast, Dr. Leonard did not start with an arbitrary "rule of thumb." Instead, he started with a comprehensive modified *Georgia-Pacific* factor analysis and used the *Microsoft* rate as a benchmark comparable in that analysis. Thus, Dr. Leonard's use of the *Microsoft* rate as part of his RAND rate analysis is perfectly appropriate and admissible. *See, e.g., Mformation Techns., Inc. v. Research in Motion Ltd.*, No. C 08-04990 JW, 2012 WL 1142537 at *3 (N.D. Cal. March 29, 2012) (denying *Daubert* challenging damages expert who relied on "Nash Bargaining Solution" in determining a royalty rate; expert's opinion admissible because he engaged in extensive analysis of the *Georgia--Pacific* factors, including, *inter alia*, considerations of analogous licensing agreements).

For similar reasons, Defendants' argument that *Microsoft* is not comparable because Microsoft and Realtek are allegedly not similarly situated does not make the *Microsoft* rate irrelevant. As a preliminary matter, Dr. Leonard testified at deposition that with respect to the '958 and '867 patents, all licensees are going to be fairly similarly situated because the major factor driving a RAND rate is the low *ex ante* value of the patents given the existence of good non-infringing alternatives. [Overend Decl., Exh. C (Leonard Depo), at 65:20-68:2.] Further, there is no legal requirement that Microsoft be "similarly-situated" to Realtek in order to use the *Microsoft* rate as a benchmark comparable. Even if such a requirement existed, the differences between Microsoft and Realtek – such as their product lines, size or competitors – are irrelevant because they all had access to the same good non-infringing alternatives. [*Id.*, at 318:16-25.] If anything, this is an issue

going to the weight of Dr. Leonard's opinion, not its admissibility.

**C. Defendants Have Failed To Articulate Any Prejudice That Would Result From Admission Of Dr. Leonard's Testimony Concerning The Microsoft Rate**

In arguing that Dr. Leonard's testimony concerning the *Microsoft* rate would be prejudicial, Defendants merely re-hash their argument that they believe the testimony to be irrelevant. But Defendants do not identify any alleged prejudice to them if such testimony were allowed. By contrast, it would be highly prejudicial to Realtek to exclude Dr. Leonard's testimony concerning the *Microsoft* rate, because it is a relevant comparable. Without it, the jury will have an incomplete universe of comparables from which to arrive at a RAND rate, creating a risk that any such rate determination could be deemed insufficiently supported. In short, Defendants have articulated no prejudice that would require exclusion of Dr. Leonard's testimony.

**IV. OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 3**

Defendants' motion to exclude the testimony of Realtek's expert Richard Donaldson is premised on the false characterization of his testimony as being relevant only to the liability issue of breach of contract – which is not an issue at trial. But as Defendants overlook, Mr. Donaldson's report and testimony were directed to the opinion that Defendants' June 2012 proposal was inherently unreasonable and thus did not satisfy Defendants' RAND obligations. Defendants have now put that determination *directly at issue* through their assertion that Realtek failed to mitigate its damages. Specifically, Defendants contend that Realtek is not entitled to all of its attorney's fees incurred in the ITC matter because it did not make a counter-offer to the June 2012 proposal.[4] Certainly, Realtek should be permitted to offer expert testimony that it would have been unreasonable to expect Realtek to respond to Defendants' June 2012 proposal, due to the inherent unreasonableness of the proposal.

Importantly, Realtek contends that Defendants should not be permitted to rely on the June 2012 proposal at all, and the Court has not yet ruled on that issue. But when recently weighing the

---

[4] Realtek has moved in *limine* to exclude Defendants from relying on the June 2012 proposal as part of any defense that Realtek failed to mitigate its damages. [Dkt. No. 179.]

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

parties' respective arguments on this issue, the Court articulated that the reasonableness of the June 2012 proposal was at the heart of the one basis of relevance it was considering. Specifically, the Court stated:

> **<u>If the jury finds that LSI's June 2012 proposal was in fact a RAND licensing offer</u>**, the question arises as to whether Realtek's refusal to accept that offer would be a basis to cut off Realtek's damages related to defending the ITC action.

[Dkt. No. 167, at 4 (emphasis added).] Mr. Donaldson's opinions are directly relevant to this very issue – as they speak to whether the June 2012 proposal was, in fact, a RAND offer. In particular, Mr. Donaldson opines that Defendants' June 2012 proposal, which came only after Defendants filed suit against Realtek in the ITC, is commercially *unreasonable* and does not comply with Defendants' RAND obligations for several reasons, including that [redacted]

Because Mr. Donaldson's testimony is relevant to whether Realtek is entitled to all of its attorney's fees incurred in the ITC, his testimony is relevant to the issues to be tried. The Court should therefore deny Defendants' motion.

### A. Background

As set forth in the Court's Order granting Realtek's motion for partial summary judgment, on March 7, 2012, LSI sent Realtek a cease and desist letter, asserting that Realtek products, as incorporated into certain third-party devices, infringe, *inter alia,* the '958 and '867 patents. [Dkt. No. 102, at 3.] Less than a week later, and without offering a license to the '958 and '867 patents, Defendants filed a complaint with the ITC naming Realtek and others as respondents and alleging, *inter alia,* that Realtek infringed the '958 and '867 patents. [*Id.*] A little over a month after LSI instigated the ITC proceeding, Realtek sent a letter to LSI requesting that it make the '958 and '867 patents available for a RAND license pursuant to Defendants' designation of these patents as essential to the IEEE 802.11 standard and their promise in the Letters of Assurance to the IEEE to license on RAND terms. [*Id.*, at 3-4.] In response, LSI sent the June 20, 2012 license proposal to Realtek.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

On May 29, 2013, Realtek served the expert report of Richard Donaldson. Mr. Donaldson is an attorney who has spent most of his career in the area of licensing intellectual property, and who worked at Texas Instruments for thirty-one years until retirement in various roles related to patent licensing. Contrary to Defendants' assertion, Mr. Donaldson's report is not limited solely to issues relating to liability for breach of contract. Instead, the report broadly assesses, among other things, whether Defendant's June 2012 proposal is commercially reasonable, based on Mr. Donaldson's extensive actual experience negotiating licenses, including licenses that included standards essential patents. [Dkt. No. 175, Exh. C (Donaldson Report), at 10, ¶ 30.] Based on his analysis, Mr. Donaldson opines that LSI's June 2012 proposal is commercially unreasonable and does not comply with Defendants' RAND obligations, including because

[*Id.* at 10-11, ¶ 31.]

In a Supplemental Case Management Order, the Court asked the parties to address the following issue: "If LSI/Agere's June 2012 proposal was a RAND proposal or an offer to negotiate RAND terms, does that offer mitigate or bar any claim by Realtek for damages incurred after June 12, 2012?" [Dkt. 152, at 1-2.] As Realtek pointed out in the parties' joint submission in response, Defendants never raised this theory during the course of the case. For example, during discovery, Defendants did not identify any fact witnesses in their Initial Disclosures with knowledge of this new theory that the June 2012 proposal somehow limited the damages Realtek could seek for breach of contract, nor did they make any such fact witnesses known to Realtek during the discovery process or in writing, such that Realtek could have pursued these issues during discovery. Likewise, none of Defendants' experts opined that the June 2012 proposal cured Defendants' breach of contract or that it limited or barred Defendants' claim for damages.

For this and several other reasons, Realtek has moved *in limine* to preclude Defendants from relying on the June 2012 proposal. [Dkt. No. 179.] However, if the Court allows the June 2012 proposal into evidence, Realtek should be allowed to proffer Mr. Donaldson's testimony that the June 2012 proposal was inherently unreasonable, such that Realtek was not required to negotiate it

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

further, particularly with the looming threat of an exclusion order from Defendants' ITC case. Mr. Donaldson's testimony is directly relevant to the issues to be tried and therefore should be allowed.

**B. Argument**

A plaintiff need only make reasonable and good faith efforts to avoid damages; unreasonable, impractical or disproportionate measures are not required. *Valle De Oro Bank v. Gamboa*, 26 Cal.App.4th 1686, 1691 (1994). Notably, California courts have not required a non-breaching party, such as Realtek, to contract a second time with the breaching party, even if doing so may assist in avoiding damages. *See Zanker Development Co. v. Cogito Systems Corp.*, 215 Cal.App.3d 1377, 1382 (2002) (plaintiff landlord need not renegotiate lease with defendant tenant who repudiated original lease and whose lease was terminated by unlawful detainer judgment even though tenant offered terms that could have avoided loss).

Here, as a threshold matter, Defendants should not be allowed to rely on the June 2012 proposal at all. As set forth more fully in Realtek's motion in limine, Defendants' breached their RAND obligations by filing the ITC action, which created an unfair bargaining environment where Realtek would have been forced to negotiate with the threat of an injunction hanging over its head. [Dkt. No. 179.] Because Defendants did not withdraw (and still have not withdrawn) the ITC action and corresponding threat of an injunction, Realtek cannot be said to have forfeited its right to recover all the fees incurred in the ITC action by refusing to negotiate to a concluded license an inherently unfair proposal from the breaching party under the duress of an injunctive threat. *See Valle de Oro Bank*, 26 Cal. App. 4th at 1691; *Zanker*, 215 Cal. App. 3d at 1382. In addition, none of Defendants' experts opined that Realtek's response to the June 2012 proposal somehow limits Realtek's damages in this matter. Instead, Defendants' damages expert, Dr. Layne-Farrar, concedes in her expert report that [redacted]

[Overend Decl., Exh. B (Layne-Farrar Report), ¶ 144.] Moreover, Defendants' reliance on the June 2012 proposal would merely invite the jury to speculate impermissibly as to what "would have" or "could have" happened between Realtek and Defendants had they engaged in extensive negotiations over the June 2012 proposal. Finally, Defendants' own discovery conduct should preclude them

REED SMITH LLP
A limited liability partnership formed in the State of Delaware