# EXHIBIT B

**Exhibit B:  Response to Proposed Rebuttal Topics for Dr. Gregory Leonard**

1. Rebuttal to Dr. Layne-Farrar's newly disclosed apportionment method using 24 patents. [Trial Tr. (2/20/14), at 1164:14-1165:19.]

   a. Dr. Layne-Farrar's apportionment method is not "newly disclosed." As she explained at trial, she used the same method as disclosed in Exhibit 9 to her report (and reflected in ¶¶ 139-143 of her report) using 19 patents instead of the 24 patents, as explained at trial. [Trial Tr. 1160:13-1166:21.] This is nothing more than an arithmetic adjustment and not a "newly disclosed" method. Realtek still has the opportunity to cross-examine Dr. Layne-Farrar at trial over her adjustment, and the original error with respect to the subtraction of the 5 patents assigned to MOSAID. There are no grounds for rebuttal from Dr. Leonard.

   b. Layne-Farrar Report at ¶¶ 139-143, Exhibit 9 and 9A.

   c. Illustrative Example:

   > 139. Lacking better data for reducing the above calculated RAND rates to terms applicable to either eight or two patents out of LSI/Agere's portfolio of standard essential patents, I therefore take Dr. Leonard's patent counting approach.

2. Rebuttal to Dr. Layne-Farrar's testimony concerning the relationship between the sophistication of LSI's licensees and the value of the two patents. [Trial Tr. (2/20/14), at 1142:23-1143:24.]

   a. Dr. Layne-Farrar discusses LSI's general licensing program at great length in her report, including how that value of licensing major companies in the industry indicates the value of LSI's patent portfolio and, consequently, the value of the two patents in suit.

   b. Layne-Farrar Report at ¶¶ 41-54.

   c. Illustrative examples:

1

> 41. As an initial matter, the fact that LSI/Agere has licensed its 802.11 standard essential patent portfolio broadly, to firms throughout the ICT sector, is a significant indication of the value of that portfolio. In particular, LSI/Agere has licenses that cover WLAN technologies with leading chip and end product manufacturers including Intel, Broadcom, Fujitsu, IBM and others.[31]
>
> 47. Taken as a whole, LSI/Agere's licensing approach, as reflected in its array of concluded license agreements, appears quite flexible and is rooted in determining the value the licensed patent portfolio offers to the licensee in relation to its products. The specific examples below illustrate this.

3. Rebuttal to Dr. Layne-Farrar's testimony concerning the preselected set of criteria she employed in determining a comparable license agreement [Trial Tr. (2/20/14), at 1149:12-1156:9.]

   a. Dr. Layne-Farrar's criteria for selecting the comparable license agreement is reflected in consecutive sub-paragraphs of her report in which she identifies the specific reasons she elected not to use the four license agreements discussed at trial, including the existence of cross-licenses (¶¶ 107(a), (c)), settlement of litigation (¶ 107(b)), no separate component rights (¶ 107(d)), lump sums (¶ 107(c)).  In her report, Dr. Layne-Farrar also explicitly explained that she did not select certain component licenses because they were not similarly situated to Realtek.  ¶ 132.
   b. Layne-Farrar Report ¶¶ 105-112, 132
   c. Illustrative example (redactions are only for confidential license terms discussed in the excerpt):

2



(b) Sony - On August 18, 2008 LSI Corporation signed a Patent License Agreement and Settlement agreement with Sony related to WLAN litigation claims arising from the both the '958 and '867 patents.[127] Sony was granted a ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅[128] However, the license specifically ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅. In addition, LSI provided a ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅. In

4. Rebuttal to Dr. Layne-Farrar's testimony concerning the risk to the patent-holder in assessing comparability of settlement agreements [Trial Tr. (2/20/14), at 1149:25-1151:3]

    a. Realtek misquotes Dr. Layne-Farrar's testimony – the cited pages are directed to the risks to an individual party in litigation that are then inherently addressed in settlement agreements, such as the risk of a finding of invalidity to the patents, which leads to settlement agreements being lower valued comparable licenses.  Dr. Layne-Farrar specifically mentions this problem in her report, including identification of Dr. Leonard's own stated concerns for using settlement agreements as an appropriate comparable.

    b. Layne-Farrar ¶¶ 107(b), 161.

    c. Illustrative example:

> 161. Finally, every one of Realtek's three concluded patent licenses represent a settlement to a litigation matter.[166] Dr. Leonard recognizes that litigation settlements pose problems as benchmarks for RAND royalties, but nevertheless relies on the Realtek-Mosaid litigation settlement in preference over LSI/Agere arm's lengths agreements that were not litigation settlements. As noted earlier, Judge Robart, in his *Microsoft v. Motorola* ruling, found that litigation settlements do not reflect RAND. While I believe that the use of litigation settlements can be warranted when no other benchmarks are available, that it is not the case here. I therefore conclude that Dr. Leonard's reliance on the Realtek-Mosaid litigation settlement is unjustified and flawed.

5. Rebuttal to Dr. Layne-Farrar's testimony concerning the comparability of the Mitsumi license [Trial Tr. (2/20/14), at 1156:10-1158:13.]

    a. Dr. Layne-Farrar's reasons for choosing the Mitsumi license as a comparable lies at the heart of her report. In addition, this topic would also be cumulative of testimony offered in Realtek's case-in-chief as Dr. Leonard testified on direct about his own criticisms of the Mitsumi license as a comparable license. [Trial Tr. (2/13/14), at 601:4-605:6.]

    b. Layne-Farrar Report ¶¶ 48, 107(e), 108-112.

    c. Illustrative Examples:

> 109. As such, Mitsumi had made no substantial, irreversible investments that could be exploited for patent holdup. In this sense, the Mitsumi license is "ex ante" (prior to investments, though not prior to the standard definition).
>
> 110. In addition, the Mitsumi license includes the two patents in suit in the ITC matter, covers LSI/Agere's other 802.11 standard essential patents to which Realtek needs a license, reflects LSI/Agere's RAND obligation, and includes a separate rate for semiconductor component sales. These factors make it highly comparable to Realtek.

4

> 111. The Mitsumi agreement is not a perfect comparable, however. First, its semiconductor devices are modules, and not chipsets. Second, it includes more than just LSI/Agere's standard essential patents, including patents that are commercially important but not technically essential for compliance with 802.11. And finally, Mitsumi's Wi-Fi related sales are smaller than Realtek's.
>
> 112. Taking the entirety of the agreement into consideration, I conclude that the Mitsumi agreement offers a solid basis for determining RAND royalties in this matter.

6. Rebuttal to Dr. Layne-Farrar's testimony concerning the value of competing technologies [Trial Tr. (2/20/14), at 1178:15-1182:14.]

   a. Dr. Layne-Farrar's cited testimony is (a) consistent with her report and (b) was in response to Dr. Leonard's own views on competing technology that were fully testified-to during Realtek's case-in-chief. Specifically, the cited passage from Dr. Layne-Farrar responds to the "Apple/Samsung" hypothetical posed to both experts by LSI's counsel. [Trial Tr. (2/18/14) at 699:1-701:19.] Further testimony from Dr. Leonard on this topic, to the extent Realtek elected not to address it on re-direct, would be cumulative on the topic and thus not proper rebuttal.

   b. Layne-Farrar Report ¶ 164.

   c. Illustrative example:

   > 164. To see more clearly the problem with simplistic patent counting assessments of royalty stacking, consider a numeric example. Suppose a standard has 5 essential patents. Further assume that the SSO members all agree that two of the patents have very low value, due to the presence of numerous alternatives; set that "low"

value at "1". Two other of the patents are agreed as having a moderate value of "3", while the remaining patent is acknowledged as pivotal for the success of the standard and as such is viewed as having a value of "5". Suppose that each patent holder gets exactly its patent's value as a royalty, so the aggregate royalty burden of implementing the standard is 13 (2*1 + 2*3 + 1*5). If we looked only at the "moderate value" patent contributors, taking a royalty of "3" as representative, we would mistakenly calculate an aggregate royalty burden of 15 (5 patent holders times a rate of "3" for each). This conclusion would represent a 15% overstatement of the actual royalty burden, however. If instead we looked only at the pivotal patent holder, taking a royalty of 5 as the basis for assessing the cumulative royalty, we would overstate the aggregate burden by even more: we would assume a burden of "25" (5 times "5"), which overstates the burden by over 90%.

7. Rebuttal to Dr. Layne-Farrar's testimony about problems in moving from a lump sum to a per unit. [Trial Tr. (2/20/14) at 11:52:14-1153:22.]

    a. Dr. Layne-Farrar's reasons for being concerned with the use of a lump sum payment for determining a running royalty are disclosed in her report. Moreover, there is no dispute that Dr. Leonard selected a lump sum payment as the base line for his running royalty in this case. Dr. Leonard had every opportunity in his direct testimony to explain why the lump sum payment selected did not face problems in converting it to a per unit royalty. Further testimony on this topic from Dr. Leonard would be nothing more than Realtek seeking to bolster its case-in-chief, which the Court has already held is not an appropriate topic for rebuttal. [Hearing Tr. (1/9/14) at 31:19-21 ("But it has to be rebuttal. It can't be a repeat of something that put in their case-in-chief or forgot to put on in their case-in-chief.")

    b. Layne-Farrar Report ¶ 36.

    c. Illustrative example:

6

36. Moreover, all of the various terms and conditions within a license agreement interrelate with one another. For example, the presence of a lump sum payment upfront tends to reduce any running royalties (either percentage or fee per unit).[26] As cross licenses from the licensee are payments in kind, with the potential to offer the licensor considerable value, their presence in a contract tends to lower both lump sum payments and running royalties. Similarly, licensing restrictions on product scope, geographic region covered, or the scope of the rights conveyed will reduce the value of the overall license and hence restricted licenses typically command reduced royalty payments.